29854. RETAIL CREDIT COMPANY v. RUSSELL.

HALL, Justice.

This is a libel case in which a jury verdict in Fulton County Superior Court awarded plaintiff Russell damages of $15,000 against Retail Credit Company (hereinafter "Retail Credit"), a commercial investigative

and reporting company which sells to its subscribers reports on individuals based on its investigations into those individuals' credit, personal, and employment backgrounds. Among the information reported by Retail Credit about Russell was the alleged libel, namely, that he was "dismissed for dishonesty and would not be eligible for rehire" and that he "admitted to taking money over a period of time" from his former employer, Top O'Peachtree.

Plaintiff's trial evidence tended to show that in the fall of 1969 while he was employed by Equitable Life Assurance Society ("Equitable Life"), he first learned that the libel was being published by Retail Credit, and it was published to his knowledge to Equitable Life. Russell then obtained from the Top O'Peachtree owner-operator, Robert H. Jones, a letter completely refuting the libel and endorsing Russell as an employee. Russell took this letter to Retail Credit asking that their records be corrected, and was assured that the matter would be reinvestigated and retractions sent to subscribers receiving the earlier, erroneous report. Later in 1969 he went again to Retail Credit and learned that retractions had not yet been sent, but they were again promised. Subsequently, having knowledge that Mr. Huey Woods with Franchise Realty Interstate Corp. (hereinafter, "McDonald's"), had received the erroneous report, Russell telephoned him to ask if he had received a retraction and was told he had not. For the third time Russell visited Retail Credit asking that the retractions be sent. Each time, Russell asked for the identities of the recipients of the earlier report, so he might contact them himself in an effort to salvage his reputation; and each time Retail Credit refused this information, saying they would take care of it.

Subsequently, during the fall of 1970, Russell saw at the offices of Culpepper Realty a recent Retail Credit report on him dated October 28, 1970, repeating the damaging misinformation about his Top O'Peachtree employment. Russell then retained an attorney who wrote to Retail Credit, receiving back a letter from Mr. Delaney in Retail Credit's legal department denying that any libelous report was present in Retail Credit's files and stating that "Quite frankly, I do not believe Mr. Russell

need be concerned about this matter." This suit was then filed. Plaintiff introduced into evidence, among other items, the October 28, 1970, Culpepper report, and Mr. Culpepper testified that he received it from Retail Credit and that he never received any retraction.

Retail Credit's trial evidence tended to show that according to their files, only two companies, State Farm Insurance Company and E. I. DuPont de Nemours & Company, received the earlier unfavorable report, and that full retractions had been sent to both companies. They made no claim that retractions had been sent to any other companies. Retail Credit, throughout the discovery phase of the lawsuit and throughout trial, disclaimed all knowledge of the defamatory October 28, 1970, "Culpepper report." Retail Credit did not, however, claim that the report was a forgery. In concluding its presentation, Retail Credit presented a witness who testified that the alleged libel was in fact true.

The case went to the jury in this posture, and the jury determined that the allegation was false and defamatory and constituted libel. Following the rendition of the jury's $15,000 verdict for Russell, the trial court additionally entered a narrowly-drawn order enjoining Retail Credit from the further publication of the adjudicated libel. Retail Credit now appeals.

I. The Fair Credit Reporting Act.

As an initial matter, we note that the Fair Credit Reporting Act, 15 USCA § 1681-1681t (Supp. 1971), effective April 25, 1971 (Act of October 26, 1970, § 602, 84 Stat. 1136), is not applicable to this suit. That Act provides a conditional privilege in some circumstances to agencies such as Retail Credit who furnish information concerning an individual directly to that individual upon his request. However, in situations such as that presented here, concerning information disseminated to subscribers of the company, the Act's conditional privilege does not apply and state libel law controls. See generally, The Fair Credit Reporting Act: Are Business Credit Reports Regulated? 1971 Duke L. J. 1229; Annot., Construction and Application of F. C. R. A., 17 ALR Fed. 675 (1973).

II. The Claim of Privilege.

The heart of Retail Credit's defense to this suit is its

claim that in providing consumer reports pursuant to its contracts with its subscribers (customers), it is protected by a conditional privilege which may be overcome only by plaintiff's showing that false and defamatory matter was published with malice.

Correctly, Retail Credit does not bottom this claim on the First Amendment, as federal decisions have made plain that no First Amendment privilege is available for false and defamatory credit or other consumer reports. As the Fifth Circuit recently ruled in disposing of such a claim of constitutional privilege when urged by Dun & Bradstreet, Inc., "We hold that matters of general and public interest do not include libelous and defamatory publications of such a commercial nature as credit reports." Hood v. Dun & Bradstreet, Inc., 486 F2d 25, 29 (5th Cir. 1973). As the Supreme Court recently wrote in an analogous context in Gertz v. Welch, 418 U. S. 323 (1974) (a decision rendered after the date of the verdict in this case), "We hold that, so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Id., p. 347.

Rather than a First Amendment claim, Retail Credit urges a statutory conditional privilege grounded in Code Ann. § 105-709. That statute recognizes certain privileges including those claimed here, namely, a privilege for statements made in the performance of a legal or moral public or private duty, (Code Ann. § 105-709 (2)), and statements made with the speaker's bona fide intent to protect his own interest (Code Ann. § 105-709 (3)). Retail Credit urges that the information here was provided pursuant to contracts with its customers, and for that reason fell within the scope of these privileges. Though we find this argument circular — Retail Credit claims the privilege exists because it has contracted to do something in the doing of which the privilege would be beneficial to it — it is not necessary to consider these Code sections as if they existed in a vacuum, because they have already been construed in a manner adverse to Retail Credit's contentions here.

In *Johnson v. Bradstreet Co.*, 77 Ga. 172, this court in

1886 considered a claim that the Bradstreet Company had libeled a merchant by an adverse mercantile report. The claimed defense was that the company was privileged under the predecessor of Code Ann. § 105-709 (2) because it acted in the performance of a public or private legal or moral duty. The court squarely rejected this defense and ruled that a mercantile report of this nature enjoyed no such privilege which would protect it from liability for false reports.

*Johnson* considered only the predecessor to Code Ann. § 105-709 (2), whereas Retail Credit additionally urges Code Ann. § 105-709 (3) as a source of privilege. However, the company's claim under the latter section is but a restatement of that claimed under the former, and need not be separately considered. Under both arguments, it is its contract with its customers which is claimed as the source of the "duty" and of the "interest" of Retail Credit. Moreover, *Western Union Telegraph Co. v. Pritchett,* 108 Ga. 411 (34 SE 216) is square authority against the latter claim, as it ruled that an exchange of information such as that considered here does not qualify for the privilege accorded one speaking to protect his own interest.

Retail Credit vigorously asserts that both *Johnson* and *Pritchett* should be overruled. It is entirely true, as Retail Credit argues, that the language of the *Johnson* opinion is moralistic and outdated, and severely denigrates the important social function of responsible credit reporting agencies which contribute to that free flow of information on which so much modern commerce depends. The reasoning of that 1886 decision need not control us now. However, our rejection of the opinion's language does not mean that its result cannot stand if upon examination we find no compelling reason to change the law of this state there established — that credit reports of the type before us enjoy no conditional privilege.

We are convinced that our law should not be changed. Apparently, 48 of the 50 states, excluding only Georgia and Idaho, recognize a conditional privilege in these circumstances. In the face of a conditional privilege, which requires that he prove malice to prevail, a falsely

maligned consumer is virtually helpless to protect or avenge his reputation. The conditional privilege recognized almost nationwide would appear to have contributed to the evils which led to passage of the Fair Credit Reporting Act. The pre-Act woes of the consumer are well detailed in Note, The Fair Credit Reporting Act, 56 Minn. L. Rev. 819, 821-824 (1972) which noted that, "Aggravating this situation [of inaccurate reports] was the inability of a person injured by a false or misleading report to recover damages in a defamation action. Virtually every jurisdiction recognized the doctrine that reports furnished in good faith to parties having a legitimate interest in the information reported possess a qualified privilege which is not lost simply because the report contains some inaccurate or defamatory matter. The consumer injured by such a report could defeat the privilege only by showing that the report had been furnished out of malice or supplied to persons with no legitimate interest in the information. Since these facts were usually absent, the agencies were effectively insulated from liability for defamation." Id. p. 823 (footnotes omitted). We cannot agree to this weighing of the scales against the individual who stands alone facing a commercial Goliath with the power to destroy — not necessarily through malice but perhaps merely from carelessness — his credit rating, commercial advantages, insurance protection and employment, all through the publication of erroneous reports concerning his affairs. In weighing the policy factors inhering in conditional privilege, "Immunity is granted or withheld on the principle of the residuum of social convenience deriving from the protection of one interest at the expense of another." 1 Harper & James, Torts, p. 435, Defamation, § 5.25 (1956). An individual living in a world more and more dominated by large commercial entities is less able to bear the burden of the consequences of a false credit or character report than the agency in the business of selling these reports. Gertz v. Welch, supra, p. 348, has recognized "the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation. . ." We hereby reaffirm the *Johnson* and *Pritchett* results and the policy of this state, that such

reports do not enjoy a conditional privilege. See also *Southeast Bankcard Assn. v. Woodruff,* 124 Ga. App. 478, 480 (184 SE2d 191).

We endorse the reasoning of the Fifth Circuit in Hood v. Dun & Bradstreet, Inc., supra, in which that court considered whether this court, presented with a proper case, would adhere to *Johnson* and its progeny or would reject them. The Fifth Circuit, reversing the district court which had come to the opposite conclusion, wrote that sound reasons existed for maintaining the Georgia law as it has traditionally existed:

"The first reason relates to the underlying principle of the conditional privilege itself. The fundamental reason for allowing credit reporting agencies to claim the conditional privilege was first enunciated in 1914. The reason was predicated upon the idea that if no privilege existed, the reporting agencies would be driven out of business by the cost of defamation suits. Consequently, sources of credit information would be unavailable, credit would be difficult to obtain, and as a result the commercial growth of our nation would suffer. Since 1914 the courts have blindly applied the privilege to credit reporting agencies apparently without examining the fundamental reason for the conditional immunity. We find at least two reasons why a Georgia court would adhere to its earlier Supreme Court decisions.

"First, this case demonstrates that in one of the states that has refused to grant the privilege, credit reporting agencies exist and are thriving on the credit reporting business. If the basic assumption underlying the rule was correct, presumably there would be no credit reporting agencies in Georgia or Idaho. Additionally, we find that Dun & Bradstreet is not the only credit reporting agency doing a thriving business in Georgia, but there are at least twenty others, one of which is Retail Credit Co., one of the largest such organizations in the United States. Moreover, an empirical study that was prepared comparing credit transactions in Boise, Idaho, where there is no privilege, with a city in its neighboring state, Spokane, Washington, where the privilege exists, also lends support to the assertion that in those states where no conditional privilege is recognized, credit information

is readily available and thus does not inhibit commercial credit transactions. Irresistible logic and the absence of empirical verification compel this court to conclude that the privilege should not be blindly applied to credit reporting agencies in this case.

"A second reason for our decision is that in recent years there has been an apparent shift in emphasis from the protection of the credit reporting agency to the protection of the individual or business enterprise being investigated. The growth in consumer protection in regard to credit reporting is obvious from legislation such as the Fair Credit Reporting Act (FCRA). 15 USCA §§ 1681-1681t (Supp. 1971). Pursuant to the FCRA, the credit agency must disclose to the consumer the substance and sources of information upon its demand, id. § 1681d, the consumer has a right to correct and explain information contained in the report, id. § 1681i, and it may limit access to those who have a 'legitimate business need.' Id. § 1681b (3) (E). Furthermore, the Act does not preclude an action at common law except where information that would give rise to a cause of action is obtained by the complainant pursuant to the provisions of the Act. Id. § 1681h (e). We feel, therefore, that based upon information and data such as empirical analysis and contemporary notions of consumer protection, the district court should have adhered to the early decisions of the Georgia Supreme Court and held that there was no conditional privilege afforded defendant under Georgia law." 486 F2d 31-32. (Footnotes omitted).

The Georgia rule accords, we think, far better than the conditional privilege recognized elsewhere, with the trend of modern authority to recognize that credit reporting agencies should be held to a fairly high standard of accuracy. Moreover, "In several cases ... [e. g., Pittsburgh Press Co. v. Pittsburgh Com'n. on Human Relations, 413 U. S. 376 (1973) and Valentine v. Chrestensen, 316 U. S. 52 (1942)] the [Supreme] Court has already drawn a distinction between 'commercial speech' and other types of statements, and held that the First Amendment restraints [on libel actions] do not apply to commercial speech. These cases involved governmental regulation of advertisements rather than

defamation, and it is uncertain whether the distinction will be held to apply to defamation actions. If it is, then the constitutional restrictions may not be applicable to such suits as a libel action against a credit rating bureau for a false report about the plaintiff's financial condition." ALI Restatement, Second, Torts § 580B Comment (e) (Tentative Draft No. 21, Apr. 5, 1975).

Retail Credit additionally urges that it would be insufficient to bottom a decision today on cases as old as *Johnson* and *Pritchett* without renewed construction of the language of the determinative Code sections which, Retail Credit argues, can only be read to grant it the privilege. The Code sections, as noted above, require for the privilege either a qualifying "duty" or "interest." Retail Credit claims that is has such a "duty" because of its contracts with its customers to make reports as requested, and that the consideration it receives for the performance of those contractual duties additionally gives it the "interest."

Though this argument seems superficially plausible, it does not take much analysis to realize that if this reasoning were accepted, one could create a conditional privilege at will merely by insuring that before speaking of another he receives or is promised a consideration for doing so. Another way of saying this is that one could freely go into the business of contracting to traffic for profit in the reputations of others secure in the conditional privilege which would flow from the fact that the contract one had created gave him a "duty" to speak, and the consideration he expected to receive therefor gave him an "interest." This kind of self-created duty and interest would produce a self-created privilege, and would gut the protection sought to be afforded by our libel statutes.

We conclude that the true meaning of these statutory sections is that the "duty" and "interest" which are sought to be protected with a conditional privilege must spring from something other than a mere undertaking to speak of others. To take a hornbook example, a father who warns his daughter that the man she loves is a scoundrel is not merely exercising his right of free speech; he is attempting to serve as best he can his pre-existing, independently established relationship of father and

protector to his child. As a further example, in *Cochran v. Sears, Roebuck & Co.,* 72 Ga. App. 458 (34 SE2d 296) the company nurse was ruled to have a conditional privilege to report to the company employing her that another employee had syphilis. Retail Credit cites this case and argues in effect that her communication was made for a consideration (her salary); her employment with the company was voluntarily created by her; her report is similar to Retail Credit's reports; and the case is therefore authority for Retail Credit's position here. We cannot agree.

The *Cochran* case shows that the nurse examined the patient in the course of her regular nursing duties, and, finding what she thought was syphilis, reported the finding to the company pursuant to established rules that *all* illnesses and injuries be so reported so that the company might be aware of the illnesses and injuries affecting its employees on the job. That case does not support Retail Credit's contentions because, to put the matter simplistically, the nurse was primarily in the business of nursing and only incidentally was required to speak of others in the course thereof; Retail Credit is primarily and solely in the business of speaking of others and has apparently no other function to perform. To extend the privilege given the nurse to Retail Credit would, as we have stated above, allow one to create the privilege at will. This result was plainly not intended by the legislature in drafting these Code sections, and "duty" and "interest" may not be construed as Retail Credit urges.

In conclusion, the publication here in issue was entitled to no privilege under Georgia law, and the trial court's refusal to charge the jury concerning privilege was correct. Retail Credit's enumerations of error numbers 1 through 4 are without merit.

### III. Truth.

Retail Credit next argues that in charging the jury on truth as a defense, the trial court erred in failing to instruct that "substantial" truth would suffice. We can find no authority in our state law for such an instruction on the facts of this case, and the trial court's failure to give it was not error.

In support of its position Retail Credit urges three Georgia cases, namely, *Mathews v. Atlanta Newspapers, Inc.,* 116 Ga. App. 337, 340 (157 SE2d 300); *Shiver v. Valdosta Press,* 82 Ga. App. 406, 411 (61 SE2d 221); and *Atlanta Journal v. Doyal,* 82 Ga. App. 321, 329 (60 SE2d 802). Those cases do not decide the question before us, because they concerned newspaper reports of court proceedings. Because of the unique policy issues such cases present, their rulings that some immaterial inaccuracies and incompleteness in newspaper accounts of judicial proceedings is nonetheless a "true" report of those proceedings, has little relevance to the instant case. In any event, they do not approve a charge of "substantial" truth, which is what Retail Credit urges.

Our statute, Code Ann. § 105-708, states that "the truth of the charge made may always be proved in justification of the libel or slander." Nothing is said of "substantial" truth. Some jurisdictions have evidently established a rule such as that urged here, but such cases seem primarily concerned with situations in which a highly detailed defamatory accusation is made and certain immaterial specifics cannot be proved. "Thus an accusation that the mayor of a town has wasted $80,000 of the taxpayers' money has been held to be justified by proof that he wasted $17,500, since there is no more opprobrium attached to the greater amount." Prosser, Torts § 116 (4th Ed., 1971). The alleged libel before us is not of that detailed type. Retail Credit asserted that Russell was discharged from his job for dishonesty after admitting that over a period of time he stole money from his employer. On these facts, the trial court did not err in refusing to charge that "substantial" truth was a defense.

We express no opinion on whether a charge of "substantial" truth is ever justified; nor on whether, if given here, it would have been erroneous; nor on whether a more carefully drawn charge, phrased perhaps in terms of immaterial inaccuracy, might not always be preferable in a situation in which the defense of truth may be sustained without proving the literal truth of each and every detail of the alleged defamatory statement.

### IV. Fraud.

Under the instructions given the jury at the

conclusion of the evidence, they were authorized to award Russell recovery on account of transactions which occurred more than a year before the action was instituted if they found that Russell was debarred or deterred earlier from bringing his action by Retail Credit's fraud.[1] It is Retail Credit's contention that the record is barren of evidence of fraud by it or its agents. Specifically, Retail Credit argues that there was no evidence that its promise to reinvestigate and retract any erroneous information was false, or that it failed to do those things. It argues that the evidence shows it sent a corrective report to

---

[1]Thus, the instruction charged the substance of the Code Ann. § 3-807 fraud exception to the usual one-year statute of limitation for injury to reputation established by Code Ann. § 3-104. The applicable part of the charge is as follows: ". . . if you should find that the plaintiff did not bring his lawsuit against the defendant within one year after the plaintiff's action of the false report because of fraud, and deceit by the defendant, then the plaintiff's permitted time for bringing the suit would begin only after he discovered such fraud by the defendant, if any. In order for you to find the statute of limitations to be extended in this manner, you would have to find as follows: first, that the defendant represented to the plaintiff the new and correct information regarding this termination at Top of Peachtree would be sent out to all customers who had received the earlier erroneous information and that the erroneous information would not be sent out any more, if you find that the information was erroneous. Second, that this representation by the defendant was false. Third, that the representation was known by the defendant to be false when it was made, or that the defendant made the representation wilfully, wantonly or recklessly without regard to its truth or falsity. Fourth, that the plaintiff relied on the representation and was deceived by it. Fifth, that the plaintiff acted with ordinary prudence in relying on the representation; and, sixth that the representation by the defendant was the summit cause of the plaintiff's delay in bringing his suit against the defendant."

"customers" receiving the old report. Contrarily, Russell asserts that the evidence showed that on three occasions Retail Credit stated to him in effect that retractions were or would be sent to *all* recipients of the libel, but that such statements were untrue, and that he was hindered in learning the true state of affairs by Retail Credit's refusal to divulge the identity of those who received the earlier report.

The evidence detailed above was ample to authorize the jury to conclude that Retail Credit had sent the libelous initial report at least to DuPont, State Farm, Equitable Life, and McDonald's; that retractions were sent only to DuPont and State Farm; that Retail Credit's repeated assurances to Russell that retractions would be sent so as to remedy the situation completely, were made without sincere intent to perform retractions to all affected subscribers; that after being provided with Russell's letter from Jones refuting the initial libel and after promising complete retractions Retail Credit nonetheless subsequently republished the initial libel to Culpepper; that after republishing the libel to Culpepper in 1970, Retail Credit in 1971 by letter to Russell's attorney denied that they had republished the libel to Culpepper; that the promise of retractions was made to Russell with the intent that he should rely thereon, and he did reasonably so rely, in forbearing to bring suit earlier. The jury were authorized by the evidence to find that each and every element required to prove fraud had been shown by Russell, and the court did not err in instructing them that fraud, were it found, would toll the statute of limitation. Retail Credit's enumerations of error 5 through 8 are without merit.

### V. Prior Restraint.

Retail Credit's final argument is that the injunction issued by the trial court restraining Retail Credit "from reporting, releasing, printing or disclosing any further information concerning Raymond F. Russell to the effect that he was 'dismissed for dishonesty and would not be eligible for rehire' and that 'he admitted to taking money over a period of time' from former employer Top O'Peachtree" was void as an unconstitutional prior restraint on expression in violation of the First and

Fourteenth Amendments to the Federal Constitution, and of that part of the Georgia Constitution codified at Code Ann. § 2-115. Retail Credit also urges that there was no evidence authorizing the issuance of such an injunction by the court sitting as a court of equity following the rendition of the jury verdict; and that procedurally the court had no authority to issue it when the question whether it should issue was never submitted to the jury.

Outside the area of obscenity, the doctrine of prior restraint is not well elaborated. However, in a recent decision the United States Supreme Court, in approving a municipal ordinance which forbade a newspaper to carry sex designated job advertising, addressed the pertinent policy questions in answering the argument that the cease and desist order commanding the newspaper to obey the ordinance constituted a prior restraint: "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment. The present order does not endanger arguably protected speech. Because the order is based on a continuing course of repetitive conduct, this is not a case in which the court is asked to speculate as to the effect of publication. Cf. New York Times Co. v. United States, 403 U. S. 713 [91 SC 2140, 29 LE2d 822] (1971). Moreover, the order is clear and sweeps no more broadly than necessary. And because no interim relief was granted, the order will not have gone into effect before our final determination that the actions of Pittsburgh Press were unprotected." Pittsburgh Press Co. v. Pittsburgh Commn. on Human Relations, 413 U. S. 376, 390 (1973).

Under the court's reasoning in Pittsburgh Press, the injunction before us is not a prior restraint offending the Federal or State Constitutions. The jury verdict necessarily found the statements of Retail Credit to have been false and defamatory, and the evidence authorized a conclusion that the libel had been repetitive. Moreover, the injunction does not interfere with Retail Credit's business activities in general, or even with its publication of further reports on Russell, provided there is no repetition

of the exact allegations found to have been libelous. Thus, prior to the issuance of the injunction "an adequate determination [was made] that it is unprotected by the First Amendment"; the "order is based on a continuing course of repetitive conduct"; and "the order is clear and sweeps no more broadly than necessary." Id. The protections recognized in Pittsburgh Press have been accorded Retail Credit and this injunction is not subject to the complaints made of it.

The authorities urged on appeal by Retail Credit do not authorize a different result. Near v. Minnesota, 283 U. S. 697 (1931) concerned what was in effect an attempt to suppress all publication by a newspaper without prior approval of the material to be published. Not only are the facts different from ours, but in finding that the Minnesota statutory scheme constituted a prior restraint, the court emphasized that the case before it did not concern the redress of individual or private wrongs. Similarly, New York Times v. United States, 403 U. S. 713 (1971) did not concern private wrongs, but the publications of governmental documents. In Organization for a Better Austin v. Keefe, 402 U. S. 415 (1971), the court reiterated that "here, as in that case [Near v. Minnesota], the injunction operates not to redress alleged private wrongs, but to suppress, on the basis of previous publications, distribution of literature 'of any kind' in a city of 18,000." Id. p. 418. The cases of Crosby v. Bradstreet Co., 312 F2d 483 (2d Cir. 1963) and Robert E. Hicks Corp. v. National Salesmen's Training Assn., 19 F2d 963 (7th Cir. 1927) are similarly inapposite because each involved a restraint sweeping far more broadly than the evil to be corrected would warrant. In Crosby the order attempted to prohibit "any" report or statement concerning the business activities of the plaintiff businessman or his brother without regard to whether it were false or defamatory. In Hicks the court's closing comment summed up the order presented: "It is hard to see how an order of injunction could be less specific in terms than this." 19 F2d 965.

It must be remembered that "it has never been held that all injunctions [against publication] are impermissible." Pittsburgh Press, supra, 413 U. S. at 390.

The order of the trial court tested by applicable standards did not fall within the prohibited area of a prior restraint, and that court did not err either procedurally or substantively in entering it. Retail Credit's enumerations of error numbers 10 and 11 are without merit.

The trial court did not err in any particular enumerated here as error, and accordingly its judgment will be affirmed.

*Judgment affirmed. All the Justices concur, except Jordan, J., who dissents from Division 2.*

ARGUED APRIL 16, 1975 — DECIDED JULY 1, 1975 — REHEARING DENIED JULY 15, 1975.

*Hansell, Post, Brandon & Dorsey, Hugh M. Dorsey, Jr., W. Rhett Tanner,* for appellant.
*William R. Parker,* for appellee.