**ADVANCED TRAINING SYSTEMS, INC. and Edwin J. Taylor, Appellants,**

v.

**CASWELL EQUIPMENT COMPANY, INC., Theodore N. Busch, and Sente Company, Inc., Respondents.**

No. C3–82–966.

Supreme Court of Minnesota.

May 25, 1984.

Eric J. Magnuson, Mary W. Mason, Minneapolis, for appellants.

Laura S. Underkuffler, Charles A. Mays, Minneapolis, for respondents.

SCOTT, Justice.

Plaintiffs appeal from the order of the Hennepin County District Court granting

in part defendants' motions for judgment n.o.v. and a new trial. Plaintiff Advanced Training Systems, Inc. (ATS) brought suit against Caswell Equipment Company, its president Theodore Busch, and the Sente Corporation, Inc., a close corporation owned by Busch and his wife, Sente Busch. In an amended complaint plaintiffs added Edwin J. Taylor, president of ATS, individually as party plaintiff. The amended complaint alleged that defendants had libeled ATS as well as Edwin Taylor personally, and had disparaged the company's products. Plaintiffs also alleged trademark and service mark infringement, unfair competition, abuse of process, and various violations of the Uniform Deceptive Trade Practices Act, Minn.Stat. §§ 325D.43–48 (1982). By counterclaim, defendants charged plaintiffs with violations of the Deceptive Practices Act and the state antitrust laws, as well as unfair competition, trademark and service mark infringement, abuse of process and malicious prosecution. At the close of the evidence, the trial court directed a verdict for plaintiffs on all of defendants' counterclaims. The court submitted only plaintiffs' libel and disparagement claims to the jury.

The jury returned a special verdict in favor of plaintiffs. It found that defendants had libeled both plaintiffs and had disparaged their products. The jury then assessed the damages to the corporation resulting from both the libel and the disparagement in a single answer on the special verdict form, as the trial court had instructed it to do. It awarded ATS $250,000 in actual damages and $450,000 in punitive damages for both torts. The jury awarded plaintiff Taylor $75,000 in actual and $250,000 in punitive damages.

The defendants moved for judgment n.o.v. or a new trial on all issues. The court granted judgment notwithstanding the verdict on ATS' claim of product disparagement, ruling that ATS had failed to prove special damages as required for a cause of action. The court felt compelled to order a new trial on ATS' damages as a result, because the jury had erroneously been asked to assess the damages to ATS as a result of both the libel of the corporation and the disparagement of its products. A new trial was thus necessary on the issue of damages to ATS flowing from the defendants' libelous statements only. The trial court also concluded that plaintiff Taylor had failed to prove the publication of any libel within the two-year statutory period and that his claim was time-barred. The court therefore granted defendants' motion for judgment notwithstanding the verdict on Taylor's libel claim as well. Finally, the court awarded plaintiff attorney fees and a permanent injunction under the Uniform Deceptive Trade Practices Act, Minn.Stat. § 345D.45 (1982).

Advanced Training Systems and Caswell Equipment Company are competing manufacturers of firearms training equipment. Municipalities and police departments make up almost the only market for these products. The equipment is designed to train police officers to use their weapons wisely even under the extreme stress of a gun battle. The equipment selectively presents human-figure targets to the police trainee by rapidly turning the target from an edged or "hidden" position to a frontal or "exposed" one. When the target is exposed, the trainee fires. The training officer can also unpredictably present "friend" or "foe" targets that require the trainee to decide very quickly whether to fire. When a group of these targets is arranged in sequence, the training officer is able to create stress in the shooter by forcing the trainee to make that decision a number of times in rapid succession.

In 1973 Caswell Equipment Company began experiencing financial difficulties and asked its bank for a small business loan. The bankers told Caswell's principals that the company needed a professional manager in order to qualify for the loan, and called their attention to a newspaper advertisement placed by an experienced corporate manager who held an MBA degree. In the advertisement, plaintiff Edwin J. Taylor offered his services to a firm seeking to expand. Caswell hired Taylor as its chief executive officer shortly thereafter.

Taylor and Caswell's principals soon became embroiled in a bitter dispute over management philosophies, and Taylor had a number of heated arguments with defendant Busch in particular. Taylor met with two key employees of Caswell during this time and discussed with them the possibility of joining him in a competing firm. The three also approached a supplier of Caswell to ask whether it would be interested in supplying such a company. In the meantime, Taylor and Busch's relationship continued to deteriorate, and Taylor left Caswell in October of 1973 after less than four months with the company. Taylor began organizing his competing firm, Advanced Training Systems, within a week. The two Caswell employees followed him a short time later.

In 1974 or 1975, defendant Busch first wrote what he called "Technical Bulletin 1217" in an attempt to persuade potential customers to buy from Caswell rather than ATS. Busch revised this bulletin slightly in 1976. The 1976 version asserted that while ATS equipment was inferior to Caswell's, it nevertheless repeatedly appeared in bid solicitations that "might otherwise have specified sound products." Caswell therefore wanted customers "to be aware of the following facts:

"1. That the ATS equipment substitutes gimmicks for needed features.

2. That it does not provide its most publicized features.

3. That the premises it is based upon are unsound."

The bulletin charged that while ATS equipment was "apparently copied from [Caswell's] concepts," it was not in the buyer's "best interest." Busch also alleged that Edwin Taylor, mentioned by name as president of Advanced Training Systems, had organized his competing firm while still an employee of Caswell. Busch distributed this document to many customers of both firms by enclosing it with his company's bids when bidding in competition with ATS.

Busch continued the attack in personal letters to customers and friends in the business. At about the time Taylor incorporated ATS, Busch stated in a letter to another firearms training manufacturer that he intended to "thoroughly neutralize" Taylor. Busch elsewhere called Taylor a "thoroughly bad egg" who was "very careless with the law," and whose company apparently thought it had a "license to steal". By letter of February 2, 1976, Busch described his experience with Taylor at Caswell as follows: "Our banker convinced us that what we needed was a sharp young MBA to run the company. What we got was an unprincipled SOB." He labeled ATS's products "shoddy" in a letter to Sergeant Burns of the Los Angeles County Sheriff's Department, and said he suspected ATS and other companies of bid- or price-rigging in a letter to another prospective customer. In a letter to Butte Community College dated September 28, 1978, Busch labeled various ATS product features "nuisance[s]" that were "of no real value" or "too difficult to use."

In 1978 Busch again revised "Bulletin 1217," this time apparently on advice of counsel. Busch deleted the assertion that Taylor had organized ATS while still a Caswell employee. Also gone was the implication that bids based on ATS specifications called for equipment that was not "sound." The charges that ATS equipment was based on unsound "premises" and contained "gimmicks" in place of "needed features" were retained, but the bulletin now stated that these were Caswell's opinions rather than "facts," as the earlier version had alleged. Taylor was mentioned only as the person "now doing business as Advanced Training Systems."

In 1977, Busch published a book called "Guidelines for Police Shooting Ranges," and continued his campaign against ATS in this new forum. In the original version of this book, Busch labeled Advanced Training Systems a "fly-by-night" company. Busch explained that while such fly-by-night firms sometimes offer attractive "gimmicks," they nevertheless are "dangerous because their simplistic solutions delay responsible decisions by training officers." Busch also claimed that the founder

of ATS had been an employee of Caswell "and actually started his operation while still with that company before he was discovered." By November of 1977, defendant Sente Company had distributed 169 copies of this book to various individuals and organizations, including law enforcement agencies, book shops, and several public libraries. In April of 1980, however, Busch deleted the allegation that Taylor had started ATS while still with Caswell from subsequent editions of the "Guidelines."

Plaintiff ATS filed suit on November 7, 1977. On or about February 10, 1981, plaintiff filed a second amended complaint adding Edwin Taylor for the first time as party plaintiff, and alleged that defendants had libeled Taylor personally. The trial court held that this amendment would not relate back to the date of the original filing. No appeal is taken from that ruling. February 1, 1979, is therefore the accepted cut-off date for the two-year statute of limitations on Taylor's libel claim. *See* Minn.Stat. § 541.07, subd. 1 (1982). The trial court instructed the jury not to consider any statements made before this for purposes of Taylor's claim. The jury by special verdict found that defendants had libeled both the corporate plaintiff and Edwin Taylor personally, and had disparaged plaintiffs' products.

After the return of the verdict, the trial court submitted a detailed memorandum explaining its own as well as the jury's conclusions. Based on the verdict, the court found that the pre-1978 version of "Bulletin 1217" libeled both plaintiffs by falsely charging that Taylor had started ATS while still with Caswell. Busch deleted this allegation in 1978, and thereafter the bulletin contained no libelous material. The bulletin nevertheless disparaged plaintiffs' products in all of its versions, and the jury could find that the bulletin contained false or misleading assertions of fact even after Busch relabeled the disparaging statements "opinions." *See* Minn.Stat. § 325D.44, subd. 1(8) (1982). The court concluded that the 1977 version of the "Guidelines" book also libeled both plain-

tiffs and disparaged their products, while the 1980 version was merely disparaging.

The trial court, however, found itself unable to sustain the jury's verdict in two important respects. First, the court ruled that "special damages" were an essential element of a cause of action for product disparagement, and that the plaintiffs had failed to prove such damages. Therefore, the jury's combined award of damages to the corporation based on both libel and disparagement had to be reversed. Second, the court held that plaintiffs had not introduced sufficient evidence of a personal libel of Taylor within the statutory period. The court reversed the jury's contrary conclusion and granted judgment notwithstanding the verdict to defendants on this claim. We affirm in part, reverse in part, and remand for further proceedings.

The following issues are before this court:

(1) Whether the evidence supported the jury's finding that defendants libeled plaintiff Taylor personally after February 1, 1979.

(2) Whether plaintiff ATS was required to prove special damages in support of its claim for product disparagement, and whether it has proven such damages.

(3) Whether special damages were required to support either plaintiff's libel claim.

(4) Whether the trial court erred in allowing the jury to consider time-barred statements of defendants in its award of punitive damages.

(5) Whether the damages awarded are excessive.

(6) Whether the trial court properly enjoined publication of the original "Guidelines" book and the pre-1978 versions of "Bulletin 1217".

(7) Whether the trial court erred in refusing to submit to the jury the defendants' claims of anti-trust violations, abuse of process and malicious prosecution, and for attorney fees under the Uniform Deceptive Practices Act.

1. The trial court held that the "single publication" rule did not apply to this action because the Guidelines book was neither mass-produced nor mass-distributed. With this we agree. It must therefore be determined whether the trial court erroneously ruled that there was insufficient evidence to support the jury's finding of a personal libel of Taylor after February 1, 1979. This factual dispute revolves around defendants' distribution of the "Guidelines" book, which the jury found had libeled Taylor.

■ The evidence at trial indicated that, of a total of 500–1000 copies of this book distributed by defendants overall, 169 went out prior to November 1977. Another 50 were the non-libelous version of April 1980. This leaves some 300 to 800 libelous copies unaccounted for that were distributed after November of 1977. Plaintiffs introduced the sales records of the Sente Company in an attempt to prove publication of the libel after January of 1979. These indicate that Sente recorded income from the sales of books totaling $2,217.00 in 1979. The purchase price of the Guidelines book was $17.50. From these facts plaintiffs conclude that 126 copies of the book were sold in 1979, and that it was reasonable for the jury to infer that at least some went out after February 1. Defendants point out that no evidence showed that the sales recorded by Sente in 1979 were actually made in that year, or that any 1979 sales were made after the first month of the year. It seems the parties simply failed to produce any evidence at all on these issues. There was evidence that Sente was not primarily in the publishing business, and no evidence that it ever published anything except the "Guidelines" book. Defendant Busch testified that the 1980 revised version of the book went out "continuously," and that Sente mailed out a copy of the earlier version whenever someone ordered it. The jury apparently concluded that Sente has continuously distributed this book since it was first published, and that at least some copies of the libelous edition went out between February of 1979 and April of 1980. This inference appears more reasonable than the theory advanced by defendant, that perhaps the otherwise continuous distribution stopped for some reason during this time. Defendants, moreover, produced no evidence in support of their theory at trial. Defendant Sente Company's own records allowed the jury to infer that sales recorded in 1979 were made in that year. This reasonable inference was not rebutted. When viewed in the light most favorable to the jury's conclusion, the evidence was sufficient to support the verdict. We therefore reverse the trial court on this issue and order the reinstatement of the jury verdict.

2. The trial court submitted a single damage question to the jury for plaintiff ATS. The jury was asked to assess the damages the corporation had suffered as the result of both libel and disparagement, in the event the jury found that defendants had committed both torts. The court submitted the single damage question because it felt the jury would have great difficulty separating the damages ATS suffered as the result of the libel from those it incurred from the disparagement. Neither party objected to this. Nevertheless, the court became convinced in the course of argument on the post-trial motions that this submission had been in error, because while "special damages" were not required for libel, they were required for disparagement.

■ This ruling of the trial court is correct. It has long been the law that plaintiff may not recover for product disparagement unless plaintiff is able to prove special damages in the form of pecuniary loss directly attributable to defendant's false statements. *See Wilson v. Dubois,* 35 Minn. 471, 473, 29 N.W. 68, 69 (1886); *see also Hayward Farms Co. v. Union Savings Bank & Trust Co.,* 194 Minn. 473, 475, 260 N.W. 868, 869 (1935); *Quevli Farms, Inc. v. Union Savings Bank & Trust Co.,* 178 Minn. 27, 28–29, 226 N.W. 191, 192 (1929); W. Prosser, *Handbook of the Law of Torts* § 128, at 922–24 (4th ed. 1971). Where plaintiff cannot show loss of specific sales, the modern view allows plaintiff to prove a general decline of busi-

ness, so long as this is shown to be the result of defendant's disparaging statements and other possible causes are eliminated. *See Erick Bowman Remedy Co. v. Jensen Salsbery Laboratories, Inc.,* 17 F.2d 255, 260 (8th Cir.1926); *cf. Wilson,* 35 Minn. at 473, 29 N.W. at 69. Here, the trial court held that plaintiffs failed to prove either the loss of a specific sale or a general decline in business. Plaintiffs do not challenge those factual conclusions.

■ Plaintiffs make two arguments in support of their contention that they nevertheless proved special damages at trial. First, they argue that ATS suffered pecuniary loss because defendants' disparaging statements prevented the company from growing as fast as it otherwise would have. The company has done quite well despite defendant's campaign, and in fact has captured about 97 percent of the market for portable firearms training equipment. Plaintiffs nevertheless contend that their business would probably have been more successful in its early years had defendant not disparaged their products. This allegation of damage is clearly "too speculative" to meet the requirement that special pecuniary loss in a disparagement case be proved with particularity. *See* Comment, *The Law of Commercial Disparagement: Business Defamation's Impotent Ally,* 63 Yale L.J. 65, 90–91 (1953); *see also* Restatement (Second) of Torts § 633 comment h (1977); *Maytag Co. v. Meadows Manufacturing Co.,* 45 F.2d 299, 302 (7th Cir. 1930) ("whether the development of the company, its natural growth, and conditions generally are such as to produce belief that the company would otherwise have grown much more rapidly, is manifestly speculative and argumentative"); *Erick Bowman Remedy Co.,* 17 F.2d at 261.

■ Plaintiffs also argue that Edwin Taylor suffered special pecuniary loss when he expended time and money attempting to counteract defendant's propaganda. Plaintiffs contend that these expenses were reasonably incurred in an effort to mitigate their losses and should have been considered an item of special damage. Taylor may not collect his expenses from defendant, however, unless defendant's conduct was tortious. Efforts to mitigate damages in tort are not compensable unless plaintiff proves a tort, and where special damages are an essential element of plaintiff's action, they must be proved before mitigation expenses may be considered. *See Bigelow v. Brumley,* 138 Ohio St. 574, 594, 37 N.E.2d 584, 594 (1941); Prosser, *supra,* § 112 at 761. Until they are, "[t]here is, in effect, no tort demonstrated." *Electric Furnace Corp. v. Deering Milliken Research Corp.,* 383 F.2d 352, 356 (6th Cir.1967). Plaintiff cannot create a cause of action in disparagement through his own conduct where defendant has otherwise failed to provide him with one.

■ Finally, plaintiffs argue that special damages should not be required in this case because all of the disparaging statements also libel ATS, or are contained in documents that do so. The thrust of this argument appears to be that no new trial is necessary because all of the disparaging material will be admissible on a retrial for damages from the libel only. Plainly, not all of defendants' disparaging statements are also libelous. The defendants' allegations that ATS produced unsound or "shoddy" goods, for example, merely disparage the product and do not libel the producer. *See National Refining Co. v. Benzo Gas Motor Fuel Co.,* 20 F.2d 763, 771 (8th Cir. 1927); *see also* Hibschman, *Defamation or Disparagement?,* 24 Minn.L.Rev. 625, 630 (1940). Even if the disparaging material is admissible on the retrial for libel, moreover, the jury will be instructed to consider the harm to ATS' business reputation from the libel only, and will not be told to consider the libel and the disparagement as independent causes of harm. The jury below was clearly told to "add up" the harm to ATS caused by these two torts. Because plaintiffs have proved one tort rather than two, this was improper. Therefore, we agree with the trial court that there must be a new trial for damages only, on the single issue of libel of the corporate plaintiff.

3. The trial court ruled that defendants had written defamatory statements "which tended to injure [ATS] in its business generally and in its dealings with its customers and potential customers." The corporate plaintiff was therefore "entitled to recover actual and punitive damages for injury to its business reputation without proof of special damages." Defendants make two arguments in their attempt to avoid this holding, and the relevance of the second depends on the validity of the first. Defendants initially argue that Minnesota draws a distinction between libel per se and libel per quod. They then assert that the statements made by defendant Busch do not fall into any of the slander per se categories, and specifically fail to "unambiguously impute fraud, deceit, dishonesty, or reprehensible business methods" to plaintiff ATS. As a result, these remarks fall into the residual category of "libel per quod" and are not actionable absent proof of special damages. Because plaintiffs could not prove such damages, defendants contend that they may not recover.

 Courts at common law presumed damages from any libel.[1] *Thorley v. Lord Kerry*, 4 Taunt. 355, 128 Eng.Rep. 367 (1812); Prosser, *Libel Per Quod*, 46 Va.L. Rev. 839, 842 (1960). The commentators, including Dean Prosser, appear to agree that this remains the rule in Minnesota, even though they disagree about whether the competing rule of "libel per quod" even exists as settled legal doctrine. Prosser, *supra*, 46 Va.L.Rev. at 847; Eldredge, *The Spurious Rule of Libel Per Quod*, 79 Harv.L.Rev. 733, 748 (1966); Note, *Minnesota Defamation Law and the Constitution: First Amendment Limitations on the Common Law Torts of Libel and Slander*, 3 Wm.Mitchell L.Rev. 81, 86 (1977). Perhaps the clearest statement of Minnesota's common law position is the statement of Justice Mitchell in *Byram v. Aikin*, 65 Minn. 87, 67 N.W. 807 (1896):

> Written publications calculated to expose one to public contempt or ridicule, and thus induce an ill opinion of him, and impair him in the good opinion and respect of others, are libelous although they involve no imputation of crime, and are actionable without any allegation of special damages.

*Id.* at 87, 67 N.W. at 808; *see also Gadach v. Benton County Co-op Association*, 236 Minn. 507, 510, 53 N.W.2d 230, 232 (1952). Under Minnesota's common law approach, therefore, the phrase "libel per se" refers to statements that are defamatory as a matter of law. These terms are not used to distinguish libel "per se" that is actionable without proof of special damages from libel "per quod" that is not. *See Morey v. Barnes*, 212 Minn. 153, 156, 2 N.W.2d 829, 831 (1942) ("To be libelous per se, words must be of such a nature that the court can say, as a matter of law, that they will tend to disgrace and degrade * * *").

The trial court held that a corporation may maintain an action for defamation on a showing that defendant's words tended to prejudice it in the conduct of its business or to deter third persons from dealing with it, and that the corporation need not prove

---

1. Prosser maintained that a majority of American courts had abandoned the common law presumption by 1960 and adopted the rule of "libel per quod." Under this approach, if statements were not defamatory on their face, and thus extrinsic evidence was required to prove that a defamatory meaning was understood by readers, the libel would be actionable only where slander would be. Thus plaintiff was required to plead and prove special damages unless the case fell into one of the "slander per se" categories, *i.e.*, imputation of crime, loathesome disease, defamation affecting business, or unchastity in a woman. Prosser, *Libel Per Quod*, 46 Va.L.Rev. 839, 844 (1960); *Hinkle v. Alexander*, 244 Or. 267, 271, 273, 417 P.2d 586, 587 (1966). In a common law jurisdiction, on the other hand, if a statement is only "capable of a defamatory meaning," the jury determines both whether a defamatory meaning was understood and the amount of plaintiff's damages. *Morey v. Barnes*, 212 Minn. 153, 156, 2 N.W.2d 829, 831 (1942); *Hinkle*, 244 Or. at 277–79, 417 P.2d at 590; Restatement (Second) of Torts § 614–16 (1977). The lower court concluded that the meaning of "libel per se" in Minnesota is unclear. Indeed, the fact that the phrase is capable of two meanings may be responsible for the entire development of the "rule" of libel per quod. *See* Prosser, *supra*, 46 Va.L.Rev. at 848; *see also* Eldredge, *The Spurious Rule of Libel Per Quod*, 79 Harv.L.Rev. 733, 735–36 (1966).

any special pecuniary damages to do so. The court therefore found that ATS was entitled to recover "actual and punitive damages for injury to its business reputation."

The trial court's holding that a corporation may recover in libel without showing special pecuniary damages was correct under present Minnesota libel law. This court has suggested that corporate plaintiffs stand on the same footing as individuals in defamation actions. *See Martin County Bank v. Day*, 73 Minn. 195, 197, 75 N.W. 1115, 1115 (1898). The only distinction generally recognized is one that the trial judge called to the jury's attention. To recover in libel, a corporation must show that defendant's written statements directly tended to affect the credit, property or business of the corporate plaintiff. *See National Refining Co.*, 20 F.2d at 766; *Erick Bowman Remedy Co.*, 17 F.2d at 257; Prosser, *supra*, § 111 at 745. This, of course, is only one category of words that may be defamatory when they refer to an individual.

4. The court properly instructed the jury not to consider on the merits any publication made prior to February 1, 1979, for purposes of Taylor's libel claim, and not to consider any made prior to November 7, 1975, for purposes of the libel claim made by ATS. The trial court nevertheless admitted into evidence a number of statements made prior to one or both of those dates, and plaintiffs pointedly called them to the jury's attention on final argument. For example, the court admitted the "thoroughly neutralize," the "thoroughly bad egg," the "very careless with the law," and the "license to steal" statements which were all time-barred as to the merits of plaintiffs' libel claims. The jury was also instructed not to consider the letter of February 2, 1976, in which Busch called Taylor "an unprincipled SOB," for purposes of Taylor's libel claim.

Defendant, citing no authority, argues that allowing the jury to consider these statements, even solely on the issue of defendant's state of mind or the duration of his conduct in order to assess punitive damages, violates the policy of repose underlying the statute of limitations. This position finds no support in Minnesota law.

Punitive damages are clearly recoverable in a libel action in Minnesota. *Loftsgaarden v. Reiling*, 267 Minn. 181, 126 N.W.2d 154, *cert. denied*, 379 U.S. 845, 85 S.Ct. 31, 13 L.Ed.2d 50 (1964); *Hammersten v. Reiling*, 262 Minn. 200, 115 N.W.2d 259, *cert. denied*, 371 U.S. 862, 83 S.Ct. 120, 9 L.Ed.2d 100 (1962). In *Hammersten* the trial court admitted, over defendant's objection, material published by defendant over six years before suit that contained substantially similar charges to those in issue. 262 Minn. at 202–03, 115 N.W.2d at 262. Plaintiff also testified that defendant, some two to three years before the matter complained of, had called him a "son of a bitch." *Id.* at 203, 115 N.W.2d at 262. This court ruled the admission of this evidence proper on the issue of defendant's "malice," and did not find the statute of limitations relevant. *Id.* at 208, 115 N.W.2d at 265. Thus, the purely personal vituperation in *Hammersten* was admissible without regard to the statute of limitations, because it tended to show malice. *Id.* at 207, 115 N.W.2d at 265. The result is the same under the statutory test for punitive damages as under the older rule requiring commonlaw "malice." The statements quoted above tend to show the "willfull[ness]" of defendant's "indifference" to plaintiff's rights. The punitive damages statute requires plaintiff to show this by "clear and convincing evidence" in order to recover such damages. Minn.Stat. § 549.-20, subd. (1)(1982). The case for admissibility is perhaps even stronger under this statute than under the "malice" test employed in *Hammersten*, because subdivision 3 expressly instructs the trier of fact to consider the duration of defendant's conduct. The jury was so instructed in this case. We find no error.

5. Defendants object to each damage award as "so excessive as to be unreasonable." *See Hammersten*, 262 Minn. at 209, 115 N.W.2d at 265–66. We

need only consider the libel award in plaintiff Taylor's favor, since that is all that is being reinstated by this opinion. The jury awarded $75,000 in actual damages and $250,000 in punitive damages to Taylor. The discretion to grant a new trial on the ground of excessive damages rests with the trial court, whose determination will only be overturned for abuse of that discretion. *Stenzel v. Bach*, 295 Minn. 257, 261, 203 N.W.2d 819, 822 (1973). Here, the trial court has expressly concluded that the punitive and "actual" damages awarded Taylor do not "appear * * * excessive" or to have been given "under the influence of passion or prejudice." We agree.

6. On May 24, 1981, the district court entered an "Order for Temporary Injunction." On February 22, 1982, the court permanently enjoined publication of the pre-1978 versions of "Bulletin 1217," addenda 1 and 2, and the original version of "Guidelines." The court based its actions on the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat. §§ 325D.44 and 325D.45. Defendants contend that the permanent injunction is an unconstitutional prior restraint on speech.

The United States Supreme Court has treated a number of different kinds of injunctions as prior restraints, typically with a citation to *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and has stricken them. *See Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). These cases may once have stood for the proposition that any injunction against speech activity was a "prior restraint" on speech. *See* Blasi, *Toward a Theory of Prior Restraint: The Central Linkage*, 66 Minn.L.Rev. 11, 12 (1981). More recently, however, the Supreme Court has stated that "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that

it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Commission on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973). This court has stated that "'[p]rior restraint' usually refers to judicial suppression, prior to publication, of expression alleged to be 'dangerous' or 'defamatory.'" *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81, 94 n.9 (Minn. 1979) (citing *Near*, 283 U.S. 697, 51 S.Ct. 625).

Under the recent decisions of this court and the United States Supreme Court, the permanent injunction below is not unconstitutional. Here, as in *Cherne*, defendants have circulated their material for a number of years, and the court and jury have had the opportunity to gauge its actual impact. A judicial tribunal has, after full adversarial proceedings, found that defendant's criticism of ATS' equipment constituted "false or misleading" product disparagement. Injunctive relief against such disparagement is specifically authorized by the Deceptive Trade Practices Act, Minn.Stat. § 325D.45, subd. (1). Clearly, false or misleading "commercial speech" may be forbidden. *Virginia State Board Of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771–72, 96 S.Ct. 1817, 1830–31, 48 L.Ed.2d 346 (1976). Other courts have also upheld the suppression of libel, so long as the suppression is limited to the precise statements found libelous *after* a full and fair adversary proceeding. *See O'Brien v. University Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 246, 327 N.E.2d 753, 755 (1975); *Retail Credit Co. v. Russell*, 234 Ga. 765, 778, 218 S.E.2d 54, 62–63 (1975). We therefore hold that the injunction below, limited as it is to material found either libelous or disparaging after a full jury trial, is not unconstitutional and may stand.

7. Defendants contend that the district court erred by directing a verdict in favor of plaintiffs on Counts I, III and IV of their counterclaim. When reviewing the trial court's granting of a directed verdict,

this court applies the same standard as the trial court. *Midland National Bank of Minneapolis v. Perranoski*, 299 N.W.2d 404, 409 (Minn.1980). "The trial court should grant the motion only when it would clearly be its duty to set aside a contrary verdict as manifestly against the evidence or when such a verdict would not comply with applicable law." *Id.*

In Count I of their counterclaim, defendants sought treble damages for plaintiffs' alleged attempt to monopolize in violation of Minn.Stat. § 325D.52 (1982). Defendants claim there was sufficient evidence at trial from which the jury could have found that plaintiffs brought this suit as part of and in furtherance of an attempt to monopolize. They claim they proved resulting antitrust damages by having to defend against plaintiffs' allegedly groundless infringement and unfair competition claims. Defendants' theory of recovery is not entirely clear and, furthermore, they have cited no authority to support their legal assertions.

 Under the federal antitrust laws, courts have allowed defendants to recover treble damages for being forced to defend lawsuits under certain limited circumstances. Courts have been reluctant to encourage such claims, as they conflict with the general policy favoring unrestricted access to the courts. *See Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 424–25 (10th Cir.), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952). Defendant may therefore prevail on such a claim only where plaintiff has brought a groundless suit in bad faith and defendant can prove this by clear and convincing evidence, *see Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980), or where plaintiff has sued with a predatory intent to destroy competition and the lawsuit forms an "integral part of a plan" to do so. *Rex Chainbelt, Inc. v. Harco Products, Inc.*, 512 F.2d 993, 1006 (9th Cir.), *cert. denied*, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975); *Kobe*, 198 F.2d at 425. Here, defendants have pro-

duced no evidence, and certainly no clear and convincing evidence, that plaintiffs' unfair competition and infringement suits were asserted in bad faith. Defendants contend that the groundlessness of plaintiffs' infringement claims was demonstrated by Taylor's admission that he only objected to use of the phrase "advanced training systems" by his competitors. Plaintiffs' entire claim, however, was based on the theory that use of plaintiffs' corporate name by competitors posed the risk of confusing the market and appropriating plaintiffs' good will. *Cf. Lawyers Title Insurance Co. v. Lawyers Title Insurance Corp.*, 109 F.2d 35 (D.C. Cir.1939). Nor is there any evidence that this suit was brought with a predatory intent and as part of an overall anti-competitive scheme. The mere fact that the court eventually dismissed a number of plaintiffs' claims in no way proves these were groundless or brought in bad faith. Defendants' counterclaims for malicious prosecution, abuse of process, and their prayer for attorney fees were also properly rejected, and for similar reasons. "The course of litigation is rarely predictable," *Scott v. Mego International, Inc.*, 524 F.Supp. 74, 75 (D.Minn.1981) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)), and the dismissal of a claim even for failure of proof does not necessarily demonstrate that it was groundless or frivolous. We see no reason to disturb the trial court's rulings on these issues.

The order of the Hennepin County District Court granting judgment notwithstanding the verdict and the judgment entered therein is partially reversed insofar as it held plaintiff Taylor's claim of personal libel time-barred. We hereby order the reinstatement of the jury verdict in favor of Taylor personally. We affirm in all other respects and order a new trial for damages only on the single issue of libel of ATS.

Affirmed in part and reversed in part.

COYNE, J., took no part in the consideration or decision of this case.