# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
March 19, 2014 Session

## IN RE: CONSERVATORSHIP OF JACK WAYNE TURNER

**Appeal from the Circuit Court for Davidson County**
**No. 12P305     David Randall Kennedy, Judge**

---

**No. M2013-01665-COA-R3-CV - Filed May 9, 2014**

---

This is a conservatorship modification case.  Appellant/Mother sought modification of the trial court's previous order, naming Appellee/Father as the conservator over the parties' mentally-disabled, adult son, and mandating that Mother's visitation with the Ward be supervised.  Because Mother had made numerous, unfounded allegations of sexual abuse against the Ward by his older brother, the trial court enjoined Mother from making any future allegations of sexual abuse against the Ward by his older brother, and further enjoined her from discussing, with the Ward, any purported sexual abuse by his older brother.  Although the trial court modified its previous order to grant Mother four additional hours of visitation per month, it ordered that her visitation would continue to be supervised.  The court further modified the conservatorship by holding that Father, at his discretion, would be allowed to tape record any telephone conversations between the Ward and Mother. On appeal, Mother contends that the injunction constitutes an unconstitutional prior restraint on her free speech. We adopt the "modern rule," holding that defamatory speech may be enjoined after a determination that the speech is, in fact, false, and upon the condition that the injunction be narrowly tailored to limit the prohibited speech to that which has been determined to be false. We conclude that the injunction in this case satisfies both of these criteria such that it does not constitute a prior restraint on Mother's free speech.  Mother also appeals the trial court's order concerning the amount of visitation, the fact that the visitation is to be supervised, and recording of her telephone conversations with the Ward. We conclude that the trial court did not abuse its discretion in allowing Mother eight hours of visitation per month.  Furthermore, because of Mother's behavior during the pendency of this litigation, we further conclude that the imposition of supervised visitation and the recording of her telephone conversation serve two functions.  First, these requirements preserve the Ward's best interest by providing safeguards against future negative impacts from Mother's actions.  Second, because Mother has shown a propensity to disregard the orders of the court,  the requirements ensure that the court's orders will be followed. Because the evidence does not preponderate against the trial

court's findings, and there is no abuse of the trial court's discretion, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Ashonti T. Davis, Nashville, Tennessee, and Susanna M. Moldoveanu, Memphis, for the appellant, Marceia Turner-Bonin.

Stanley A. Kweller and Margaret Lane Johnson, Nashville, Tennessee, for the appellee, Bruce Wayne Turner.

**OPINION**

Appellant Marceia Catherine Turner-Bonin ("Mother") and Appellee Bruce Wayne Turner ("Father") are the parents of Jack Wayne Turner ("Son," or "Ward"). Jack Wayne Turner was born in May 1988; the parties are also the parents of an older child, Joseph Turner ("Joseph" or "Older Son"). Son was born with Downs Syndrome, and has had special needs throughout his life. Although the procedural history of this case is protracted, beginning with the February 24, 2012 filing of an emergency petition for conservatorship of Jack Wayne Turner by Father, the issues before us in this appeal are relatively narrow in that they arise from the trial court's decision on two motions filed by Mother. As discussed, *infra*, the first motion, filed on December 14, 2012, was titled "Motion for Restoration of Visitation/Parenting Time and Other Relief;" the second motion, filed on January 15, 2013, was titled "Motion for Immediate and/or Emergency Relief." Before addressing these motions and the court's ruling on them, we begin with a brief history of the case.

The trial court appointed Robert W. Briley to act as Son's guardian *ad litem* in this case. We take the relevant background history from Mr. Briley's second answer and report to the trial court, filed on August 17, 2012. These predicate facts appear to be uncontested in the record. Mother and Father were divorced in 1994, while living in Texas. Mother was granted primary custody of the parties' two children. Sometime in 1998, the children came to live with Father because of some type of disturbance in the Mother's life centered around domestic violence and alcohol abuse. An order was allegedly entered in the parties' divorce case, which order granted temporary custody of the children to Father; this order is not in our record. Son remained in Father's care, even after he reached the age of majority in 2006. Although the dates are uncertain, it is undisputed that Father subsequently married Jill

Turner, and moved to Nashville with the children. Mother followed them to Tennessee. Father later moved with the children to Westland, Michigan; Mother remained in Nashville, where she still resides.

Since the Father assumed custody of the children, Mother has had only limited visitation, which was granted at Father's discretion. In 2008, Mother began treatment for alcoholism, and has allegedly remained sober since August of 2008. In 2011, Mother was allegedly advised by legal counsel that, because Son had reached the age of majority and because there was no conservatorship in effect over him, she would not violate any court order if she chose to bring Son back to Nashville with her during her scheduled Christmas visitation that year. Therefore, in December of 2011, while on a pre-arranged day visit with Son, Mother refused to return Son to Father, and brought him to Nashville.

While Son was in Nashville with Mother, on January 12, 2012, she filed a petition for an order of protection in the Davidson County Circuit Court. Therein, Mother alleged that both she and Son were afraid of Father, that Father had drugged Son and had kept him locked in the basement, and that Father would not allow him contact with Mother. In response, on February 24, 2012, Father filed an emergency petition for conservatorship of Son in the Davidson County Circuit Court's Probate Division. Therein, Father averred that Mother's objective in keeping Son was to obtain his Social Security Disability benefits, and that the allegations in her petition for an order of protection were false. On the same day, February 24, 2012, the trial court dismissed Mother's petition for an order of protection. Thereafter, on March 29, 2012, Mother filed an intervening petition, requesting that she be appointed Son's permanent conservator. An agreed order was entered on March 29, 2012. The agreed order provided that the parties would propose a qualified psychiatrist to evaluate Son. In the interim, the order provided that Son would remain in Mother's custody, and that Father would have scheduled visitation and daily telephone calls. Also on March 29, 2012, the trial court heard testimony from Son's relatives, as well as a Children's Counselor with the Domestic Violence Unit of the Metropolitan-Nashville Police Department. The court subsequently entered an order, on May 8, 2012, regarding temporary conservatorship for health care purposes and access to HIPPA protected information. In this order, the court found, by clear and convincing evidence, that Son was "in immediate need of a temporary conservator for health care," and that Mother would serve as Son's health care conservator on an interim basis, until such time as the guardian *ad litem* could prepare a full report based on current circumstances, and until such time as Son could be independently evaluated.

The aforementioned evaluation was conducted by a psychiatrist, Dr. Casey Arney. The guardian *ad litem*'s second answer and report of August 17 notes that: "[M]other has made several reports about the [F]ather to the police since she has been in possession of [Son], none of which have resulted in any action or further investigation." The guardian *ad*

*litem* indicated that he had spent considerable time with Son and members of the family. He noted that Son remained calm and appeared comfortable in the presence of both parents and, in sum, opined that there was "no evidence that [Son] is being or has been abused or neglected by either the [F]ather (and family) or [M]other." As included in the guardian *ad litem*'s report, Dr. Arney concluded that Son was "not capable of providing meaningful substantive responses to the questions presented in this action." Based upon the totality of the evidence he reviewed, the guardian *ad litem* made the following recommendations:

> There is no dispute that [Son] needs a conservator. Although disputed, there is no evidence that [Son] has ever been abused or neglected while in his father's custody or care . . . . Both the mother and father are capable of serving as [Son's] conservator and of providing him with the educational and other opportunities for him to move towards living as independent a life as is possible, and everyone agrees that this should be the stated goal.
>
> The quality that materially separates the parties, however, is stability. The mother's unilateral decision to bring [Son] to Nashville and her lack of participation in [Son's] life over the years for whatever reason, fail to demonstrate the type of decision making required of a conservator under these circumstances. The father, on the other hand, has shown the ability to keep [Son] involved in educational and extracurricular programs consistently over a period of years. . . . This is not to say that the mother is not capable of providing for [Son] as she has demonstrated over the past few months . . . . When, however, all of these facts are digested during the course of the best interest analysis, the father's track record and history tip the scale ever so slightly in his factor.

On August 21, 2012, the trial court conducted a hearing on the competing petitions for conservatorship. Following the hearing, a transcript of which is not included in our record, the trial court entered an order on August 31, 2012, naming Father the conservator of Son. However, the court noted that Son "clearly loves both of his natural parents and both of [Son's] parents love him." Accordingly, Mother was granted visitation, including two weeks during Christmas holidays, several days over Thanksgiving and Easter, and two months over summer vacation.

On August 31, 2012, Mother filed an emergency motion to reconsider and to suspend visitation immediately based on evidence of immediate danger or irreparable harm, wherein

she requested that the court:

> . . . suspend visitation immediately and indefinitely pending the outcome of full investigations by Adult Protective Services and Davidson County Tennessee Metropolitan Police Department based on reports of sexual assault that occurred to [Son] while in [Father's] care and custody. There are reports and documentation of sexual assault from Friends Life that Adult Protective Services has from Jameson Elder, Megan Graf, and Waverly Christopher-Harris. [Son] acted out the sexual assault he suffered at the hands of his brother Joe, to Jameson Elder when asked to do so by Waverly Christopher-Harris.
>
> The school records from Friends Life were given to Paul Kai Kai with Adult Protective Services and could not be released to [Mother] for legal reasons by the school.
>
> These are reports from Mary Francis Hall, PhD. She evaluated Jack on 8-28-12 and the sexual assault was confirmed.
>
> There are reports from David McMillian. His evaluation occurred on 8-30-12. David McMillian is willing to address the court immediately with his findings. Dr. McMillian feels [Son] is in imminent danger and the sexual assault was confirmed.

The trial court held a hearing on Mother's motion on September 18, 2012. On September 28, 2012, the trial court entered an order, indicating that it had heard from witnesses, including Mary Francis Hall, PhD, Paul Kai Kai, with Adult Protective Services, Detective Vicky Dills, with the Metropolitan Police Department, Lani Remos, Social Worker, Joe Turner, Jill Turner, and Father. The court's order also indicates that it conducted an interview with Son. Based upon this evidence, the court held that the allegations of sexual abuse alleged by Mother were "unsustainable. Finding that the preponderance of the evidence did not support Mother's allegations, the court dismissed her motion, thus affirming Father's role as conservator for Son.

On September 20, 2012, Father filed an emergency petition, seeking suspension of Mother's parenting time (other than supervised visitation). Therein, Father averred that, based upon certain email correspondence with Mother, he believed that Mother had joined an organization called the Republic of the United States of America, which organization does not recognize the authority of civil courts. Based upon Mother's alleged email statements,

such as "I will allow no one to continue to put my son's safety, well fair [sic], and health in jeopardy," Father believed that Mother would not adhere to the trial court's previous order, naming him conservator. Father's petition was heard on September 28, 2012.

At the September 28, 2012 hearing, the trial court first entertained Mother's attorney's petition to withdraw, which petition was granted. Thereafter, Mother proceeded *pro se*. At the hearing, the trial court considered Mother's email correspondence, which Father had alleged represented her intention to disregard the court's order. Based upon this evidence that court stated, from the bench, that:

> It is your communication with other people that suggests to them that you are a troubled person who is unwilling to accept [what the court] imposed [and] required [by] order [on] those matters that I have set forth. And until you convince me you're able to do that, I'm not going to loosen it up.

Based upon the foregoing, the court held:

> I'm going to suspend your parenting time or visitation time with [Son] pending further orders of the Court with the exception that I'm going to allow you to have no more than four hours of visitation with him once per month pending further orders of the Court. That parenting time is going to be supervised by an adult approved by your ex-husband . . . .

The trial court entered an order to this effect on October 29, 2012. Mother did not appeal this order.

On December 14, 2012, after obtaining a new attorney, Mother filed a motion for restoration of visitation/parenting time, seeking to modify the October 29, 2012 order to reinstate her previous, unsupervised visitation with Son. While this motion was pending, on January 14, 2013, Mother filed an additional motion for immediate and/or emergency relief, wherein she asserted that there had been a substantial and material change of circumstances since the entry of the trial court's last order. Specifically, Mother asserted that, "[s]ince the court's last hearing, [Son] has reported that he has been physically and sexually abused by his biological brother." In support of her motion, Mother provided the court with a CD and transcript of alleged telephone conversations between herself and Son. Although, as discussed above, the trial court found the previous allegations of sexual abuse, which allegedly occurred on or about August 20, 2012, to be "unsustainable," Mother again cited the previous allegations of abuse as an additional ground for her January 15, 2013 motion.

-6-

Father filed responses in opposition to both of Mother's motions.

Both of Mother's motions were heard on March 26 and May 28, 2013. In the interim between hearing dates, on May 7, 2013, Father filed a motion to remove Mother as a backup or secondary conservator. Following the hearing, the trial court entered an order on June 24, 2013. The order provides, in relevant part, as follows:

> The central issue in this case in regards to all issues currently outstanding by and between the parties is what is in the manifest best interest of the Ward []. The Court finds that Marceia Turner-Bonin continues to file allegations or make allegations regarding criminal misconduct about her eldest son that are baseless, meritless and not based on any fact whatsoever and that she has not presented one single bit of evidence that would suggest to any reasonably informed adult person that would sustain cruel, vicious, marauding allegations of destruction that she has heaped upon her own oldest son, Joseph Turner.
>
> . . . . The Court further finds that, notwithstanding her argument that she is simply trying to do what she believes to be best for her son, Jack Turner (the Ward herein)[, Mother has made] the most disingenuous representation that this Court has had presented to it by a mother of a child.
>
> The Court finds that [Mother] has not told the truth and that she conveniently leaves out the truth on a regular basis. The Court finds that her actions stated in social media and claims she has made are slanderous, libelous, and defamatory and without a factual basis and all made to win the favor of people to make her out to be victimized. The Court further finds that these attempts[,] including all the baseless and meritless defamatory claims against her oldest son[,] are intended to take the conservatorship away from the father. Based upon these findings, the Court is of the opinion and does find that it is not in the manifest best interest of Jack Turner (the Ward) to be in an unsupervised relationship with someone who is so vested in a lie, vested in a falsehood, and vested in perpetrating a fraud on the public about her oldest son.

The Court specifically finds that in the parade of witnesses offered by [Mother], there has been no substantiation or evidence whatsoever that the Ward has been harmed, abused or neglected in any way by his brother, Joseph Turner. The Court finds that [Mother] should be required to cease and desist from engaging in baseless, meritless and fraudulent claims of illegality or illegal conduct on the part of someone who committed no wrongful acts and for whom there has been no evidence of the commission of any wrongful acts.

Based upon the foregoing findings, the court went on to hold that:

[Mother is] restrain[ed] and enjoin[ed] . . . from claiming that her oldest son . . . is guilty of any criminal conduct . . . . Additionally, [Mother] shall be restrained and enjoined from questioning, interrogating, communicating with and engaging in dialog with Jack Turner [] regarding her insinuation that he has somehow been physically probed or someone has carnal knowledge of him specifically his [brother].

Although the court enjoined Mother from pursuing any allegations of sexual abuse, the court did find that:

The Court does find, however, that it is important for [Son] to see his mother on a specific, regular basis but it is going to be in a setting which is in [Son's] best interest. The Court finds that [Mother] should be allowed to have a total of eight (8) hours per month of supervised time with the Ward . . .the dates and times to be agreed upon by the parties.

In addition, Mother was granted telephone communication with Son; however, the court stated that:

[I]t is appropriate, given [Mother's] behavior and multiple false allegations regarding the behavior of her oldest son with her youngest son, that [Father] has specific power to tape record every telephone conversation between the Ward and [Mother].

Based upon the foregoing, the court reaffirmed Father as Son's conservator. In addition, the trial court named Joseph Turner as the stand-by conservator for Son, stating:

-8-

> [W]hile [Mother's] conduct is reprehensible and shows an extraordinary lack of good judgment, the behavior and conduct of Joseph Turner . . . has shown unquestionable integrity, and a calm demeanor in the face of terrible allegations.

The June 24, 2013 order also specifically incorporates, by reference, the trial court statements from the bench during the May 28, 2013 hearing.

Mother appeals. She raises two issues for review, which we take from her brief:

> 1. Whether an injunction permanently enjoining a mother from communicating with her child about alleged sexual abuse constitutes an unconstitutional prior restraint.
>
> 2. Whether the trial court abused its discretion in the entry of an order (1) permitting only eight hours of visitation per month, based solely on a finding of dishonesty, and (2) ordering that all phone calls between a mother and child may be recorded, without limitation.

## Prior Restraint

Mother contends that the trial court's injunction constitutes an unconstitutional prior restraint on her free speech. We first note that Mother does not appear to have raised the issue of prior restraint in the trial court. It is well settled that issues not raised at the trial level are considered waived on appeal. *Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn.2009) (stating that issues not raised in the trial court are waived on appeal); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Our research has revealed cases from other jurisdictions where the issue of prior restraint was deemed waived for failure to raise it in the trial court. *See, e.g., U.S. v. Stover*, 650 F.3d 1099 (8th Cir. 2011) ("Tax attorney waived argument on appeal that district court's injunction against his promotion of fraudulent tax avoidance schemes was an unconstitutional prior restraint of otherwise protected speech, where attorney failed to raise the issue at trial, even though government sought extremely broad relief, including much of the relief granted in the district court's permanent injunction."); *Zielke v. Wagner*, 684 N.E.2d 1095 (Ill. Ct. App. 1997) ("Insurance brokers waived their claim on appeal that protective order prohibiting reference to settlement of plaintiff's claims against third–party defendants violated their First Amendment rights where brokers did not make any prior restraint argument before trial court, thereby depriving trial court of any opportunity to

employ its discretion."); ***Patraw v. Groth***, Nos. 53918, 54573, 2011 WL 6257862 (Nev. Dec. 12, 2011) ("We conclude that [plaintiff] waived her arguments regarding the ban being unconstitutionally broad and a prior restraint on speech because she failed to raise these issues in district court."). Although there is authority to support a finding that Mother has waived her prior restraint issue, the record is not developed such that we are able to determine what notice Mother had, or what opportunity she had to raise this issue. Because of the sensitive nature of this case, and in an abundance of caution, we exercise our discretion under Rule 2 of the Tennessee Rules of Appellate Procedure to address this issue substantively. Tenn. R. App. P. 2 ("For good cause, including the interest of expediting decision upon any matter, the . . . Court of Appeals . . . may suspend the requirements or provisions of any of these rules in a particular case on motion of a party or on its motion and may order proceedings in accordance with its discretion.").

An impermissible "prior restraint" exists when the exercise of First Amendment rights depends upon prior approval of public officials. ***Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.***, 274 F.3d 377, 400 (6th Cir. 2001), *cert. denied* 535 U.S. 1073 (2002). A system creating prior restraints bears a heavy presumption against its constitutional validity. *Id*. (citing ***Freedman v. Maryland***, 380 U.S. 51 (1965)). In the context of protected speech, "'prior restraint' is a label used in constitutional law to describe administrative or judicial orders that forbid a communication when issued in advance of the time that the communication is to occur: Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated." 2 J. Thomas McCarthy, Rights of Publicity and Privacy § 11:24 Injunctions–Prior Restraint Rule (2d ed.). Accordingly, the First Amendment of the United States Constitution, and Article I, Section 19 of the Tennessee Constitution, provide broad protections to prevent the abridgment of a person's right to freedom of speech. These protections require the application of strict scrutiny review when a court is presented with the question of whether a person's fundamental rights, such as freedom of speech, have been infringed. *See generally* ***San Antonio Indep. School Dist. v. Rodriguez***, 411 U.S. 1, 16 (1973). Strict scrutiny requires that the restraint on speech be "narrowly tailored to serve a compelling governmental interest." ***Pleasant Grove City, Utah v. Summum***, 555 U.S. 460, 469 (2009).

In the instant case, and as set out in full context below, the trial court made a specific finding that Mother's allegations of sexual abuse were "baseless, meritless, defamatory claims," and further found that the claims are "very cruel, vicious, visceral, acidic, butchering, marauding allegations." The court also specifically found that Mother has not "presented one scintilla, not even a grain, not even an atom, not even a neutron of evidence that would . . .sustain the [allegations]." In ***Sullivan v. Baptist Mem. Hosp.***, 995 S.W.2d 569 (Tenn. 1999), our Supreme Court explained:

To establish a *prima facie* case of defamation in Tennessee, the plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *See* Restatement (Second) of Torts § 580 B (1977); ***Press, Inc. v. Verran***, 569 S.W.2d 435, 442 (Tenn. 1978). "Publication" is a term of art meaning the communication of defamatory matter to a third person. ***Quality Auto Parts Co. v. Bluff City Buick Co.***, 876 S.W.2d 818, 821 (Tenn. 1994).

*Id*. at 571–72. To be actionable, the allegedly defamatory statement must "constitute a serious threat to the plaintiff's reputation." ***Stones River Motors, Inc. v. Mid–South Publ'g Co.***, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983). We note at the outset that "Tennessee has adopted the standards of 580(a) and 580(b) of the Restatement (2d) of Torts, 1977, which establishes the distinction between defamation as to a public official or public figure and defamation as to a private person." ***Press, Inc. v. Verran***, 569 S.W.2d 435, 442 (Tenn.1978). Accordingly, if the plaintiff in a defamation case is a public official or public figure, they must also prove that the defamatory statements were made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." ***New York Times Co. v. Sullivan***, 376 U.S. 254, 279–80, 84 S.Ct.710, 11 L.Ed.2d 686 (1964). The public figure must demonstrate actual malice by clear and convincing evidence. *Id*. at 285–86, 84 S. Ct. 710. Because this case does not involve public figures, the actual malice standard is not required. As to a private person, he or she may be held liable for defamation if he or she knows that the statement is false and that it defames the person, or if he or she acts in reckless disregard of these matters, or acts negligently in failing to ascertain them. *Verran*, 569 S.W.2d at 442. Moreover, a private person is not subject to the heightened clear and convincing standard required of a public person, and thus may satisfy the *prima facie* case for defamation by a preponderance of the evidence. *See, e.g.,* ***Murray v. Lineberry***, 69 S.W.3d 560 (Tenn. Ct. App. 2001). Because this case concerns findings of defamatory statements made by a private individual against a private individual, our analysis does not extend to questions of injunctions against defamatory statements made against public figures.

From the trial court's findings, we have determined that, based upon its conclusion that the allegations were both false, and made for a fraudulent and harmful purpose, the trial court was proceeding under a finding that the enjoined statements were defamatory, and that its purpose in enjoining these statements was to protect both Joseph and the Ward from further harm caused by the perpetuation of the defaming statements. These findings are supported by a preponderance of the evidence, and neither party disputes them on appeal.

Based upon the trial court's prior holding that the allegations were "unsustainable," and based upon the myriad investigations by various authorities, there is no dispute that the statements of sexual abuse were, in fact, false. At the least, Mother made the allegations with reckless disregard of their truth. The statements were made to third parties. The statements, given their nature, posed a serious threat of harm to Joseph's reputation. Consequently, there is sufficient, undisputed evidence in the record to support a finding that the enjoined statements were, in fact, defamatory. As such, we find guidance in the case law concerning whether injunctions against defamatory statements constitute a prior restraint against free speech. We note that there are no Tennessee cases directly on point. However, we find guidance in the decisions made by our sister states. *See, e.g.*, **Shelby Cnty. Health Care Corp. v. Baumgartner**, No. W2008-01771-COA-R3-CV, 2011 WL 303249, at *12 n.14 (Tenn. Ct. App. Jan. 26, 2011) ("Cases from other jurisdictions can be persuasive authority . . . .").

We begin with the traditional rule that "equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages." *See, e.g.,* **Lothschuetz v. Carpenter**, 898 F.2d 1200, 1206 (6th Cir.1990) (quoting **Cmty. for Creative Non–Violence v. Pierce**, 814 F.2d 663, 672 (D.C. Cir. 1987)); **Kyritsis v. Vieron**, 382 S.W.2d 553 ( Tenn. Ct. App. 1964) (relying on the traditional rule that there is no equity jurisdiction in defamation cases). Injunctions to enjoin a libel are traditionally disfavored under both common-law and First Amendment prior restraint doctrines. *See, e.g.*, **Alberti v. Cruise**, 383 F.2d 268 (4th Cir. 1967); **Parker v. Columbia Broadcasting System, Inc.**, 320 F.2d 937 (2d Cir. 1963); **Crosby v. Bradstreet Co.**, 312 F.2d 483 (2d Cir. 1963); **Kukatush Min. Corp. (N.P.L.) v. Securities and Exchange Commission**, 309 F.2d 647 (D.C. Cir. 1962); **Robert E. Hicks Corp. v. National Salesmen's Training Ass'n**, 19 F.2d 963 (7th Cir. 1927); **Konigsberg v. Time, Inc.**, 288 F. Supp. 989 (S.D.N.Y. 1968); **American Broadcasting Companies, Inc. v. Smith Cabinet Mfg. Co., Inc.**, 312 N.E.2d 85 (Ind. 1974); **Greenberg v. De Salvo**, 229 So. 2d 83 (La. 1969); **Krebiozen Research Foundation v. Beacon Press, Inc.**, 134 N.E.2d 1 (Mass. 1956); **Willing v. Mazzocone**, 393 A.2d 1155 (Pa. 1978); **Pirmantgen v. Feminelli**, 745 S.W.2d 576 (Tex. Ct. App. 1988); **Community for Creative Non-Violence v. Pierce**, 814 F.2d 663, 672 (D.C. Cir. 1987) ("The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.").This disfavored status has its roots in traditional maxims governing the law of equity. *See generally*, Dan Dobbs, Handbook on the Law of Remedies § 7:2, at 524 (1973); Robert Leflar, *Legal Remedies for Defamation*, 6 Ark. L. Rev. 423 (1952); Roscoe Pound, *Equitable Relief Against Defamation and Injuries to Personality*, 29 Harv. L. Rev. 640, 651 (1916); **Crosby v. Bradstreet Co.**, 312 F.2d 483, 485, (2d Cir. 1963) (holding that injunction directed to "any" statements violated the First Amendment). In more contemporary times, these maxims of equity have been reinforced by the First Amendment's heavy presumption against prior restraints. *See, e.g.*, **Corpus Christi Caller-Times v. Mancias**, 794 S.W.2d 852

(Tex. Ct. App. 1990) (prohibiting newspapers from publishing misleading or deceptive headlines that were not substantiated by the contents of the article was an impermissible prior restraint); *Dworkin v. Hustler Magazine, Inc.*, 634 F. Supp. 727 (D. Wyo. 1986); *Bright v. Los Angeles Unified Sch. Dist.*, 556 P.2d 1090 (Cal. 1976) (prohibiting the publication of an allegedly libelous article in a school newspaper was an unconstitutional prior restraint on children's right to free speech); *Matchett v. Chicago Bar Ass'n*, 467 N.E.2d 271 (Ill. 1984) (prohibiting the evaluation of a prospective judge using the term "unqualified" was an unconstitutional prior restraint).

There have, however, been a number of inroads made on the broad rule against injunctions to enjoin defamatory statements. Our own Sixth Circuit has authorized a limited injunction prohibiting an individual "from continuing and reiterating the same libelous and defamatory" statements in accordance with a more modern rule. As discussed in more detail, *infra*, the *Lothschuetz* Court specifically "limit[ed] the application of such injunction to the statements which have been found in . . . proceedings to be false and libelous." *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (Guy, J., majority opinion except as to injunctive relief), 1209 (Wellford, J., majority opinion as to injunctive relief, concurring in part and dissenting in part); *Lassiter v. Lassiter*, 456 F.Supp.2d 876, 884 (E.D. Ky. 2006) (concluding that Kentucky courts would permit injunctive relief against defamation where, *inter alia*, the injunction is "clearly and narrowly drawn" and that there has been an adjudication of falsity or illegality, established "by at least clear and convincing evidence," prior to the issuance of the injunction) (footnote omitted), *abrogated by* *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 309 (Ky. 2010) ("[D]efamatory speech may be enjoined only after the trial court's final determination by a preponderance of the evidence that the speech at issue is, in fact, false, and only then upon the condition that the injunction be narrowly tailored to limit the prohibited speech to that which has been judicially determined to be false.") (see further discussion below).

One of the watershed cases in the area of injunctions in defamation cases is *Balboa Island Village Inn, Inc. v. Lemen*, 156 P.3d 339, 40 Cal. 4th 1141, 57 Cal. Rptr. 3d 320, (2007), *as modified*, (Apr. 26, 2007). In *Balboa*, the Supreme Court of California held that, after a defamation trial in which a defendant was found to have repeatedly defamed the plaintiff, California law and the First Amendment permitted the issuance of an injunction to prohibit the future repetition of certain defamatory statements about the defendant. *Id*. at 341. The *Balboa* case arose from a defamation action brought by the Balboa Island Village Inn ("Village Inn"), a restaurant and bar located on Balboa Island in Newport Beach, California, against Anne Lemen, the owner of an establishment called the "Island Cottage," which was located across an alley from the Village Inn. Lemen was a vocal critic of the Village Inn, who frequently complained to authorities about the Village Inn, alleging excessive noise and citing the behavior of inebriated customers leaving the bar. *Id*. Lemen

videotaped matters relating to the Village Inn approximately fifty times, either from her own property or from her Volkswagen bus parked across from the Village Inn. *Id*. As recounted by the court, there was evidence that Lemen's actions were often more intrusive. *Id* Customers often asked Lemen not to videotape them. *Id*. She sometimes followed customers to their cars. *Id*. She took flash photographs through the windows of the Village Inn. She called customers "drunks" and "whores." *Id.* She told customers entering the Village Inn, "I don't know why you would be going in there. The food is shitty." *Id*. She approached potential customers outside the Village Inn more than one hundred times, causing many to turn away. *Id* In one instance she allegedly stopped her Volkswagen bus in front of the Village Inn and sounded her horn for five seconds. *Id*. Lemen also had numerous unpleasant encounters with Inn employees, telling them such things as that they "worked for Satan" or would "have Satan's children." *Id.* Lemen also made claims that were more pointedly false, and defamatory. She made claims that there was child pornography and prostitution going on in the Village Inn, and that the Village Inn was selling drugs and was selling alcohol to minors. *Id*. She said that sex videos were being filmed inside the Village Inn, that it was involved with the Mafia, that it encouraged lesbian activity, and that the Village Inn stayed open until 6:00 a.m. *Id.* There was evidence that sales at the Village Inn dropped as much as twenty percent from such activity. *Id.*

The Village Inn sued Lemen for defamation, nuisance, and interference with business, and sought injunctive relief. Following a trial, the trial court issued a permanent injunction against Lemen. The injunction barred Lemen from engaging in many of the activities complained of, including the making of a number of specific defamatory statements. *Balboa*,156 P.3d at 342 The California Supreme Court held that the injunction was overly broad, but that, with narrowing, it was permissible both as a matter of California state law and as a matter of First Amendment prior restraint doctrine, holding that "an injunction issued following a trial that determined that the defendant defamed the plaintiff that does no more than prohibit the defendant from repeating the defamation, is not a prior restraint and does not offend the First Amendment." *Id*. at 343.

The *Balboa* decision is also important because the court traced the history of prior restraint law from Blackstone through the passage of the First Amendment to modern times. The *Balboa* Court heavily emphasized that the history and policy underlying the prohibition against prior restraint was aimed principally at preventing speech from being published, not at remedies to redress wrongs for speech after it had been published. In turn, prior restraint law evolved to bar injunctions against the publication of speech on the ground that the speech, if published, would be defamatory. The court thus observed that the "prohibition against prior restraints of the press led to the rule that the publication of a writing could not be prevented on the grounds that it allegedly would be libelous." *Id.* at 344. In 1839, the court observed, the New York Court of Chancery refused to prevent the publication of a

pamphlet that allegedly would have defamed the plaintiff, holding that the publication of a libel could not be enjoined "without infringing upon the liberty of the press, and attempting to exercise a power of preventative justice which . . . cannot safely be entrusted to any tribunal consistently with the principles of a free government." *Id*. (citing *Brandreth v. Lance*, 8 Paige Ch. 24, 26, 4 N.Y. Ch. Ann. 330, 1839 WL 3231 (N.Y. Ch. 1839)). Importantly, the central theory of the California Supreme Court in *Balboa* was that there is a fundamental equitable and constitutional divide that distinguishes preventing a person from speaking or publishing something that, allegedly, would constitute a libel if spoken or published, and issuing "a posttrial injunction after a statement that already has been uttered has been found to constitute defamation." *Id*. at 344–45 ("Prohibiting a person from making a statement or publishing a writing before that statement is spoken or the writing is published is far different from prohibiting a defendant from repeating a statement or republishing a writing that has been determined at trial to be defamatory and, thus, unlawful. This distinction is hardly novel.").

Furthermore, the *Balboa* Court marshaled an impressive list of examples of judicial decisions, from an array of state and federal courts, in which injunctions against defamatory speech had been upheld following a trial and an adjudication of liability. Beginning with English precedent, the court noted that, in *Saxby v. Easterbrook and Hannaford*, 1877 WL 17383, (1877–78), L.R. 3 C.P.D. 339 (U.K. C.P. 1878), Lord Coleridge, writing for the English Court of Common Pleas, stated: "I can well understand a court of Equity declining to interfere to restrain the publication of that which has not been found by a jury to be libelous. Here, however, the jury have found the matter complained of to be libelous"*Balboa*,156 P.3d at 345(quoting *Saxby*). A similar conclusion was reached in a nineteenth century American case from Missouri, with the court concluding that "[a]fter verdict in favor of the plaintiffs, they can have an injunction to restrain any further publication of that which the jury has found to be an actionable libel or slander." *Id*. (citing *Flint v. Hutchinson Smoke-Burner Co.*, 110 Mo. 492, 19 S.W. 804, 806 (1892)). The *Balboa* Court also noted the great American legal scholar Roscoe Pound's Harvard Law Review article, which was published in 1916, stating that English courts would allow "an injunction in case the libel was repeated or publication was continued after a jury had found the matter libelous." *Id*. (citing Roscoe Pound, *Equitable Relief Against Defamation and Injuries to Personality*, 29 Harv. L. Rev. 640, 665 (1916)).

After canvassing many United States Supreme Court decisions involving prior restraints outside the context of defamation, the California Supreme Court drew the conclusion that the United States Supreme Court had frequently held that an "injunctive order prohibiting the repetition of expression that had been judicially determined to be unlawful did not constitute a prohibited prior restraint of speech." *Balboa*,156 P.3d at 347 (citing *Kramer v. Thompson*, 947 F.2d 666, 675 (3d Cir. 1991) ("The United States Supreme Court

has held repeatedly that an injunction against speech generally will not be considered an unconstitutional prior restraint if it is issued after a jury has determined that the speech is not constitutionally protected."); *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 891–892, 4 Cal. Rptr. 3d 69, 75 P.3d 1 (2003), *as modified*, (Oct. 15, 2003) ("a preliminary injunction poses a danger that permanent injunctive relief does not; that potentially protected speech will be enjoined prior to an adjudication on the merits of the speaker's or publisher's First Amendment claims") (Moreno, J., concurring)). In addition to *Kramer* and *Bunner*, the *Balboa* Court noted that the Ohio Supreme Court has upheld a complaint that sought injunctive relief to prohibit the defendant from repeating statements after those statements were proven at trial to be defamatory. *Id*. at 347–48 (citing *O'Brien v. University Community Tenants Union, Inc*., 327 N.E.2d 753, 755 (Ohio 1975)). Likewise, in *Retail Credit Company v. Russell*, 218 S.E.2d 54 (Ga. 1975), the Georgia Supreme Court rejected a claim that an injunction constitutes an unconstitutional prior restraint on expression, stating:

> The jury verdict necessarily found the statements of Retail Credit to have been false and defamatory, and the evidence authorized a conclusion that the libel had been repetitive … . Thus, prior to the issuance of the injunction "an adequate determination [was made] that it is unprotected by the First Amendment;" the "order is based on a continuing course of repetitive conduct;" and "the order is clear and sweeps no more broadly than necessary." . . . The protections recognized in *Pittsburgh Press* have been accorded Retail Credit and this injunction is not subject to the complaints made of it.

*Retail Credit Company*, 218 S.E.2d 54, 62–63 (quoting *Pittsburgh Press Co. v. Pittsburgh Com'n on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973)). The Georgia court added: "The present order does not endanger arguably protected speech. Because the order is based on a continuing course of repetitive conduct, this is not a case in which the court is asked to speculate as to the effect of publication." *Id*. at 62; *accord Advanced Training Systems, Inc. v. Caswell Equipment Co., Inc*., 352 N.W.2d 1 (Minn. 1984) ("[C]ourts have . . . upheld the suppression of libel, so long as the suppression is limited to the precise statements found libelous after a full and fair adversary proceeding. . . . We therefore hold that the injunction below, limited as it is to material found either libelous or disparaging after a full jury trial, is not unconstitutional and may stand.") (citations omitted); *Sid Dillon Chevrolet-Oldsmobile-Pontiac, Inc. v. Sullivan*, 559 N.W.2d 740, 747 (Neb. 1997) (recognizing that the "general rule" that "equity will not enjoin a libel or slander" does not necessarily apply to an injunction prohibiting speech that is issued following a trial at which the statements have been found to be unlawful); *Nolan v.*

*Campbell*, 690 N.W.2d 638, 652 (Neb. 2004) ("Here, the restraint via the injunction is permissible because the speech had been adjudicated to be libelous and therefore not to be protected under the First Amendment. Therefore, the trial court did not err in issuing an injunction.").

The California Supreme Court in *Balboa* also pointed to two contemporary decisions by federal courts of appeal to further buttress its argument. In *Auburn Police Union v. Carpenter*, 8 F.3d 886 (1st Cir. 1993), the United States Court of Appeals for the First Circuit upheld an injunction under a Maine law that prohibited solicitations for the benefit of a law enforcement officer, agency, or association, holding that the law has never been that all injunctions are impermissible, and that "[a]n injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint." *Id*. at 903. The *Balboa* Court also cited the Sixth Circuit's opinion in *Lothschuetz v. Carpenter*, 896 F.2d 1200 (6th Cir. 1990).

The plaintiffs in *Lothschuetz* brought a libel claim against the defendants and obtained a default judgment on the liability issue. *Id*. at 1203. The trial court awarded nominal damages, but rejected the plaintiffs' request for an injunction, reasoning that it would be an "unwarranted prior restraint on freedom of speech." *Id*. at 1206. On appeal to the Sixth Circuit, the plaintiffs, relying on First Amendment grounds, argued that the district court should have granted injunctive relief. *Id*. The appellate court agreed and reversed and remanded the case to the district court to enter an injunction prohibiting the defendants from "continuing and reiterating the same libelous and defamatory charges." *Id.* at 1208–09 (Wellford, J., for the court, concurring in part, dissenting in part). The Sixth Circuit reasoned that "an injunction [was] necessary to prevent future injury to [the plaintiffs'] personal reputation and business relations" given the defendants' "frequent and continuing defamatory statements." *Id*. However, the appellate court limited the injunction to "statements . . . found in this and prior proceedings to be false and libelous." *Id*. Accordingly, the Sixth Circuit reversed and remanded to the district court to enter a "narrow and limited injunction" prohibiting the defendants "from continuing and reiterating the same libelous and defamatory charges." *Id*.

Although the *Lothschuetz* case was brought as a libel action, it is important to note that the libel was found by default. The majority of cases in which the court's have held that injunctions against defamatory statements were not prior restraints have been decided after an adjudicatory hearing where the court has determined, by a preponderance of the evidence, that the enjoined speech is, in fact, defamatory. As noted above, that is not the case in the instant appeal. This matter was not brought as a defamation action, and there was no hearing specifically regarding that issue. Nonetheless, in the course of the conservatorship

proceedings, the trial court specifically determined that the enjoined statements were, in fact, defamatory, and we conclude that the preponderance of the evidence supports this finding. The ***Lothschuetz*** Court determined that, "[a] default judgment in a libel case 'is only conclusive as to liability and does not constitute an admission as to damages.'" ***Lothschuetz***, 898 F.2d at 1205  (quoting ***Meehan v. Snow***, 494 F.Supp. 690, 698 (S.D. NY.1980), *rev'd on other grounds*, 652 F.2d 274 (2d Cir. 1981)).  As discussed in Lawrence A. Pivnick, Tennessee Circuit Court Practice, § 27.2 (2012):

> Judgment by default (previously called judgment *pro confesso*)[, which is governed by Tennessee Rule of Civil Procedure 55.01,] is an expediting procedure which acts as a deterrent to defending parties resorting to delay as an element of their litigation strategy. Generally, a default judgment is sought by a party seeking "affirmative relief" when his adversary fails to properly and timely respond to an initial pleading....
>
> Generally, the entry of a default judgment has the effect of an answer admitting the well-pleaded material allegations of fact contained in the adversary's pleading and fair inferences therefrom....

*Id*. (footnotes omitted).  Although a judgment by default is considered a final order disposing of a case on its merits, *see, e.g., **Patterson v. Rockwell Int'l***, 665 S.W.2d 96, 101  (Tenn. 1984), this is only because a default judgment is generally considered an admission of all the properly pleaded material allegations of fact in the complaint (except the amount of unliquidated damages).  ***Id***.  However, a default judgment is not a disposition of the case in the traditional sense of adducing facts at a hearing, weighing those facts,  and adjudicating the case on the evidence.  In this regard, it has often been said that "dismissals based on procedural grounds like failure to prosecute and default judgments run counter to the judicial system's general objective of disposing of cases on the merits." ***Henry v. Goins***, 104 S.W.3d 475, 481 (Tenn.2003) (citing ***Childress v. Bennett***, 816 S.W.2d 314, 316 (Tenn.1991) ("[I]t is the general rule that courts are reluctant to give effect to rules of procedure . . . which prevent a litigant from having a claim adjudicated upon its merits[.]"); ***Tenn. Dept. of Human Servs. v. Barbee***, 689 S.W.2d 863, 866 (Tenn.1985) (noting that the "interests of justice are best served by a trial on the merits")). Because the speech in ***Lothschuetz*** was libelous only by virtue of default, and not as a result of the trial court's adjudication on the evidence adduced at a hearing, we conclude that ***Lothschuetz*** provides authority that, in some cases, a full, adjudicatory hearing is not required in order for a court to determine that the enjoined speech is, in fact, defamatory.  However, there must be a finding that the speech is false, and that finding must be supported by a preponderance of the evidence in the record (again, our analysis does not extend to defamation concerning public persons).  That is the

case here. Although the question of whether the speech was defamatory was not specifically litigated, the trial court nonetheless found that it was. From our review of the record, the preponderance of the evidence supports this finding, *see* discussion *supra*. Based upon the cases and authority discussed herein, the gravamen of these cases appears to be enjoining the further dissemination and repetition of false and harmful statements. As noted by the ***Balboa*** Court, "following a trial at which it is determined that the defendant defamed the plaintiff, the court may issue an injunction prohibiting the defendant from repeating the statements determined to be defamatory." ***Balboa***, 156 P.3d at 360 (citing ***Aguilar v. Avis Rent A Car System, Inc.***, 980 P.2d 846, 21 Cal. 4th 121, 140, 87 Cal. Rptr. 2d 132 (1999) ("[O]nce a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting the repetition, perpetuation, or continuation of that practice is not a prohibited 'prior restraint' of speech.")). Importantly, in reaching this ruling, the ***Balboa*** Court also dismissed the aphorism that "equity will not enjoin a libel," holding that the asserted "rule" that civil damages are the only remedy for defamation was not an accurate description of the history of common-law and not sound as a matter of policy. *Id*. at 362. Rather, the court reasoned that what mattered was that courts maintain the distinction between "requests for preventive relief prior to trial and post-trial remedies to prevent repetition of statements judicially determined to be defamatory." *Id*. at 350. To accept the argument that the sole remedy for defamation is an action for damages, the court reasoned, "would mean that a defendant harmed by a continuing pattern of defamation would be required to bring a succession of lawsuits if an award of damages was insufficient to deter the defendant from continuing the tortuous behavior." *Id*. at 351.

The California Supreme Court did hold that the injunction as initially crafted by the trial court was overly broad. It applied not just to Lemen, but also to her agents and others acting on her behalf, typical boilerplate for injunctions, despite any evidence that she had any such cohorts involved in the defamatory activity. The court thus limited the injunction to Lemen alone. The court also narrowed the reach of the injunction by holding that it could not be crafted to prevent Lemen from presenting her grievances to government officials. In addition, the court held that the restriction on all contact with the employees of the Village Inn was too broad, because it included no time, place or manner limitations to constrain it. As to the possibility that changes in circumstances might render permissible a statement that was defamatory, because a statement once false may become true later in time, the court held that upon notice and motion the trial court could always dissolve or modify the injunction. *Id*. at 353. The same is true here. As set out above, the injunction in this case does not limit Mother's ability to return to the court to seek a modification or dissolution of the injunction if she later suspects that the circumstances have changed such that Joseph is somehow abusing Son. The injunction merely enjoins Mother from making these allegations publicly, and from discussing such allegations with the Son directly.

Five Justices on the California Supreme Court joined the majority opinion in ***Balboa***. Two Justices dissenting from the court's core holding were Justice Kennard and Justice Werdegar. Justice Kennard wrote a concurring and dissenting opinion, arguing that the sole remedy for defamation should be money damages, and that the injunction was an unconstitutional prior restraint. ***Balboa***, 980 P.2d at 355 (Kennard, J., concurring and dissenting). The flaw of the majority opinion, Justice Kennard argued, was its "failure to appreciate that whether a statement is defamatory cannot be determined by viewing the statement in isolation from the context in which it is made, the facts to which it refers, and the precise wording used." ***Id***. at 356 (Kennard, J., concurring and dissenting). Justice Kennard thus argued that a "statement previously adjudged to be defamatory, and thus not protected by the First Amendment, may, when spoken in the future at a particular time and in a particular context, not be defamatory for a number of reasons, and thus be entitled to constitutional protection." ***Id.***

Similarly, Justice Werdegar argued that "[u]nlike in ***Aguilar***, where we were called on to balance countervailing constitutional concerns with the demands of the First Amendment free speech guarantee, the present case involves a garden-variety defamation under state law." ***Balboa***, 980 P.2d at 360 (Werdegar, J., concurring and dissenting). Finding the interests favoring the injunction insufficient to outweigh the powerful line of cases articulating the heavy presumption against prior restraints, Justice Werdegar, like Justice Kennard, would have found the injunction a violation of the First Amendment. ***Id***.

We have spent a substantial portion of our analysis on ***Balboa*** not only because it is informative regarding the history of this area of the law, but also because it has provided authority for other court's to adopt a more modern rule concerning injunctions against defamatory speech. For example, in ***Hill v. Petrotech Resources Corp***., 325 S.W.3d 302 (Ky. 2010), the respondents sued Hill for defamation, and filed a motion for a temporary injunction to prohibit Hill from making further defamatory statements about them. The trial court enjoined Hill from contacting any of the respondents' customers for the purpose of defaming the respondents and from publishing or making any defamatory public comments about the respondents' business practices. In determining whether the temporary injunction violated Hill's First Amendment rights, the Kentucky Supreme Court stated that, because the injunction prohibited Hill from making future statements about the respondents, the injunction was a prior restraint and, therefore, it presumed that the injunction was invalid. ***Id***. at 306. Citing ***Nebraska Press Ass'n v. Stuart***, 427 U.S. 539 (1976), and several federal circuit cases, the court noted the general rule that equity will not enjoin a libel. ***Id***. It also noted that, despite an emerging trend toward permitting injunctions upon an adjudication that the alleged defamatory speech was false, there "remain staunch advocates of the traditional rule that a prior restraint on speech is unacceptable under any circumstances. As noted by the ***Hill*** Court, this position, along with supporting authorities, is defended by prominent

-20-

constitutional law professor Erwin Chemerinsky in his law review article, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157 (2007)." *Id*. The Kentucky Supreme Court explained Professor Chemerinsky's position:

> Defenders of the traditional rule argue that we should not disturb the maxim that equity will not enjoin defamation, and that injunctions should never be allowed as a remedy in defamation cases. Professor Chemerinsky argues that even after a judicial determination that the speech at issue is false, "[t]he injunction means that a person can only speak by going before the judge and getting permission. That is the very essence of a prior restraint." [Chemerinsky, 57 Syracuse L. Rev.] at 163. He advocates that "[i]f history matters in interpreting the First Amendment, it could not be clearer: injunctions were not allowed as a remedy in defamation actions." *Id*. at 168. In his view, it is always the case that "damages, not injunctions, are the appropriate remedy in a defamation action," *id*. at 169, "even in the case of the "judgment proof defendant[.]" *Id*. at 170. Under the traditional rule, it is of no concern that the defendant may not be able to pay the damage award because "[c]ourts . . . do not find that damages remedies are inadequate simply because the plaintiff cannot afford to pay them." *Id*.

*Id*. at 306–307. However, according to the Kentucky Supreme Court, the traditional view is flawed because its rationale "is severely undercut by the countervailing view that defamatory speech is unguarded by the Constitution." *Id*. at 307. It explained:

> Application of the rules relating to unprotected speech would compel the conclusion that the First Amendment is not even implicated in the case of false, defamatory speech, and therefore the Constitution poses no bar to any injunction restraining such speech.
>
> "From 1791 to the present," the First Amendment has "permitted restrictions upon the content of speech in a few limited areas," and has never "include[d] a freedom to disregard these traditional limitations." *R.A. V. v. St. Paul*, 505 U.S. 377, 382–383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). These "historic and traditional categories long familiar to the bar," *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 127, 112 S.Ct. 501, 116 L.Ed.2d 476

(1991) (Kennedy, J., concurring in judgment), include obscenity, ***Roth v. United States***, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); defamation, ***Beauharnais v. Illinois***, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952); fraud, ***Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.***, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); incitement, ***Brandenburg v. Ohio***, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (*per curiam*); and speech integral to criminal conduct, ***Giboney v. Empire Storage & Ice Co.***, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949). These are "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." ***Chaplinsky v. New Hampshire***, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); ***U.S. v. Stevens***, 559 U.S. 460, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010).

Defamation's place on the list of unprotected speech is secure. As straightforwardly stated in ***Beauharnais*** almost sixty years ago, "[l]ibelous utterances [are not] within the area of constitutionally protected speech." ***Beauharnais***, 343 U.S. at 267, 72 S.Ct. 725.

***Hill***, 325 S.W.3d at 307. Nonetheless, the Kentucky Supreme Court agreed that "[w]hat is or is not defamatory expression cannot often be summarily ascertained. A rush to enjoin distasteful, annoying, unpopular, or even damaging speech would often result in the suppression of truthful, legitimate discourse." ***Id***. Thus, the Kentucky Supreme Court found "it appropriate to consider a more modern and moderate analysis that recognizes the need to minimize the damage of unprotected, defamatory speech in a way that preserves the important constitutional values of free speech and due process." ***Id.***

The Kentucky Supreme Court stated that the recognition that defamatory speech is not protected by the First Amendment has led to the development of "a modern, superseding rule" that, once a trial court or a jury has made a final determination that speech is defamatory, the speech determined to be false may be enjoined. ***Id***. at 308. It noted that the rule has been stated in 42 Am Jur 2d, Injunctions, § 97, as the following:

[T]he prohibition [against enjoining defamation] is not absolute, as there are exceptional cases in which a prior restraint is acceptable. For instance, an injunction would issue to prohibit a defendant from reiterating statements which had been found

-22-

in current and prior proceedings to be false and libelous to prevent future injury to the libel plaintiff's personal reputation and business relations. An injunction restraining the publication of matter defaming a plaintiff personally [is] proper where there [is] no adequate remedy at law because of the recurrent nature of the defendant's invasions of the plaintiffs [sic] rights, the need for a multiplicity of actions to assert the plaintiffs [sic] rights, the imminent threat of continued emotional and physical trauma, and the difficulty of evaluating the injuries in monetary terms.

*Hill*, 325 S.W.3d at 307. The Kentucky Supreme Court adopted the modern rule, holding that defamatory speech may be enjoined only after a final determination that the speech at issue is false and, upon the condition that the injunction be narrowly tailored to limit the prohibited speech to that which has been determined to be false. *Id.* It set aside the injunction that the trial court had granted the respondents because there had not yet been an adjudication that the alleged defamatory statements were, in fact, false. *Id.*

Numerous other courts, both federal and state, have held that a trial court may enjoin a defendant from making defamatory statements after there has been a determination that the speech is, in fact, false. *See, e.g., Lothschuetz*, 898 F.2d at 1208–1209; *Balboa*, 156 P.3d at 348–49; *Caswell Equip. Co., Inc.*, 352 N.W.2d at 11; *Sid Dillon Chevrolet-Oldsmobile-Pontiac*, 559 N.W.2d at 733; *O'Brien*, 327 N.E.2d at 755; *Kramer*, 947 F.2d at 676–677. Several of these cases rely upon the United States Supreme Court's decision in *Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations*, 413 U.S. 376, 390; 93 S. Ct. 2553; 37 L.Ed.2d 669 (1973). In *Pittsburgh Press*, the Supreme Court, after noting that it has never held that all injunctions on expression are impermissible, stated that "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." In his article, Professor Chemerinsky discusses similar problems associated with an injunction limited to statements that have been determined to be false:

An injunction that is limited to preventing repetition of the specific statements already found to be defamatory is useless because a defendant can avoid its restrictions by making the same point using different words without violating the court's order.

Moreover, even if the injunction is limited to particular statements already found false, defamatory, and uttered with the requisite mental state, a prospective prohibition on the same

-23-

statements cannot guarantee satisfaction of the elements of defamation at every point in the future. A statement that was once false may become true later in time. Likewise, even if a defendant in a defamation action once acted with the requisite degree of culpability, he or she may have a different mental state later. Defamatory statements about public figures are outside the scope of the First Amendment only when the plaintiff can "prove both that the statement was false and that the statement was made with the requisite level of culpability." Permitting permanent injunctive relief in a defamation case absolves the defamation plaintiff of his or her burden to demonstrate falsity and culpability each time a purportedly defamatory statement is made. Thus, unlike injunctions on particular obscene motion pictures, enjoining defamatory speech will inherently reach too far and be overbroad because "[i]t is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable."

Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. at 171–172 (internal citations omitted).

Despite these concerns, based upon the foregoing discussion and supporting authority, we adopt the "modern rule" and hold that defamatory speech may be enjoined after a determination that the speech is, in fact, false. We are persuaded by the argument that, because defamatory speech is not protected by the First Amendment, such an injunction does not violate the amendment's guarantee of free speech. Furthermore, based upon the leeway allowed under the ***Lothschuetz*** case, and as discussed in detail above, we conclude that the finding that the enjoined speech is false does not, necessarily, have to be made after a full evidentiary hearing specifically in a defamation lawsuit. However, the trial court issuing the injunction must, nonetheless, make a finding that the enjoined speech is defamatory, which finding must be supported by a preponderance of the evidence. Once the speech is found to be false, the question becomes whether the injunction is sufficiently narrow to survive strict scrutiny.

Turning to our record, the question is whether the trial court's injunction against Mother's questioning the Ward, or raising any further accusations of sexual abuse of the Ward, is sufficiently narrow to survive strict scrutiny. In the first instance, Mother's argument on this issue is based upon a misapprehension, and an overly broad reading of the trial court's order. In her brief, Mother states that the injunction "forbids [her] from asking

or even 'communicating with and engaging in a dialog with' her [S]on about sexual abuse forevermore in the future." (quoting the trial court's June 24, 2013 order). Implicitly, she contends that the court's order prohibits her from engaging in any dialogue with Son or any other person regarding any type of abuse, or mistreatment that may be perpetrated upon Son by anyone. We read the court's order more narrowly. A trial court speaks through its orders. ***Palmer v. Palmer***, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1997). Here, as set out above, the court ruled that Mother would be restrained and enjoined "from claiming that her **oldest son** . . . is guilty of any criminal conduct . . . ." (Emphasis added). Additionally, the court restrained and enjoined Mother "from questioning, interrogating, communicating with and engaging in dialog with [Son] regarding her insinuation that he has somehow been physically probed or someone has carnal knowledge of him specifically his [brother]." As noted above, the trial court's June 24, 2013 order also incorporates, by reference, its comments from the bench during the May 28, 2013 hearing. In relevant part, the court stated:

> [I]s it in [Son's] manifest best interest to be in an unsupervised relationship with someone who is so vested in a lie, so vested in a falsehood, so vested in perpetuating a fraud upon the public **about her oldest child** and is so—so enamored with the concept that I can keep him protected by accusing my other child of wrongdoing, that has never occurred because that's what we've got here.

(Emphasis added).

Based upon the statements from the trial court and the plain language employed in its order, we conclude that the injunction is narrow, and applies only to forbid Mother from making further claims against her oldest child, Joseph, concerning sexual abuse against Son. She is further enjoined from questioning Son about such sexual abuse at the hands of his brother. As discussed above, we do not read the injunction to go so far as to prevent Mother from seeking dissolution or modification of the injunction in the future through proper motion in the trial court. Furthermore, the injunction does not enjoin Mother from speaking with Son, or from speaking out if she thinks that he is somehow in danger, or in an abusive relationship. But, it does prevent her from making these allegations publically against the oldest son, Joseph.

At the May 28, 2013 hearing, the trial court specifically stated:

> There has never been a single moment throughout this entire trial when [Mother] has ever presented one scintilla, not even a grain, not even an atom, not even a neutron of evidence that

would suggest to any reasonabl[y] informed adult person whether they were a judge, a lawyer or an objective layperson that would sustain the very cruel, vicious, visceral, acidic, butchering, marauding allegations of [sexual abuse against Son] that she has heaped upon [her oldest child, Joseph].

After a thorough review of the record, we agree with the trial court. The record indicates that, during the time this case was pending before the trial court, Mother contacted authorities close to twenty times to allege that her oldest son, Joseph, had perpetrated sexual abuse on Son. These allegations were made to authorities both in Nashville, and in Michigan. Despite the myriad allegations, after investigation, none were ever substantiated. Officer Brandon Paris, a Michigan Police Officer, was deposed and his deposition was admitted at trial. Therein, he testified that "the nature of the call was unfounded." In addition, Corporal Isaac Wood, with the Metropolitan Nashville Police Department, testified concerning Mother's allegations of abuse that were made in Nashville. His report, admitted as Trial Exhibit 5, does not support Mother's allegations. Officer Wood gave no testimony to suggest that Son was being abused or that the Nashville Police Department had need to investigate the allegations further.

Sylvia Pendleton, a case worker with the Michigan Adult Protective Services, testified that Mother had made approximately eighteen complaints against her oldest son. Ms. Pendleton testified that, after numerous home visits, none of the complaints were "founded, proven, or sustained." In fact, Ms. Pendleton stated that, because there was no indication whatsoever of abuse against Son, Mother's claims were eventually denied by her department. In addition, the guardian *ad litem* conducted several interviews with the Ward and the family, and determined that there was no evidence of any abuse against Son.

Finally, both Joseph Turner and Father testified that Joseph, who lives in his own home with his girlfriend, had not been alone with Son on any of the occasions that Mother alleged he had sexually abused his brother. In its ruling from the bench on May 28, 2013, the trial court specifically found "that there's clear and convincing evidence that [Joseph] has never been alone with his brother from the date of his testimony, which he testified to, until the present. Such that no allegations could have reasonably–no such conduct could have been engaged in."

Despite the fact that all of Mother's allegations of sexual abuse against her oldest son have gone unfounded, Mother has continued to perpetuate these accusations. As stated by the trial court in its May 28, 2013 ruling from the bench:

And I think it's the most disingenuous representation that I have

ever had presented to me by a mother of a child. . . [t]o think that you can constantly and continuously over the span of at least nine times in the last nine months, and apparently many more before . . . claim that your oldest son has raped your youngest child. . . .

\*\*\*

Are we going to be back here again six months from now after she's filed six more baseless, meritless, defamatory claims against her oldest son in a ploy to take the conservatorship away from [F]ather? That concerns me a great deal.

\*\*\*

But is it in [Son's] manifest best interest to be in an unsupervised relationship with someone who is so vested in a lie, so vested in a falsehood, so vested in perpetuating a fraud upon the public about her oldest child and is so–enamored with the concept that I can keep [Son] protected by accusing my other child of a wrongdoing that has never occurred because that's what we've got here.

We agree with the trial court that the problem is not only Mother's continued insistence that abuse occurred without evidence to support that allegation, but also that Mother's baseless accusations center around her oldest son. In clinging to her unfounded accusation that Joseph is abusing his brother, Mother has affected the relationship between the two brothers, who had been very close. Indeed, the evidence shows that Older Son has made a concerted effort to avoid interaction with Son, in order to stymy Mother's continuing accusations. In addition, Father testified that Mother's continual questioning of Son regarding her allegations greatly upset Son:

[Mother] gets [Son] upset. And he will . . . scream no, no, no and sometimes he will just hang up the phone when he's talking to her and he will get really upset.

This case is highly unique in that Mother has continued to levy meritless attacks against Older Son despite the fact that the court has previously found all her allegations to be "unsustainable," and despite the fact that every allegation has been determined to be unfounded even after numerous investigations by various authorities. From the record, it

-27-

appears that Mother's resolve to perpetuate these allegations against Older Son, even to the detriment of the Ward, is so fervent that the trial court was forced to take the drastic step of enjoining her from raising another allegation of sexual abuse of the Ward by Older Son. Given the particular circumstances of this case, we cannot conclude that the trial court's injunction was too broad to survive strict scrutiny. Had the trial court enjoined Mother, as she argues, from ever speaking out about any abuse against the Ward by any person, we could possibly conclude that such ruling would be an unconstitutional prior restraint. However, because, as discussed above, the injunction is narrowly drawn to include only allegations against Older Son, and because of the shear number of unfounded allegations Mother has made against him, we conclude that the trial court had no less drastic option but to hold that she be enjoined from making any future allegations of sexual abuse against the Ward by his brother.

## Modification of Conservatorship Order

By order of October 29, 2012, the court granted Mother "no more than four hours of visitation with [Son] once per month," and further held that this visitation would be "supervised by an adult approved by [Father]." The instant appeal arises from Mother's attempt to modify the conservatorship by two motions. First, Mother's December 14, 2012 motion for restoration of visitation/parenting time, seeking to reinstate unsupervised visits with Son, and her January 14, 2013 motion for emergency relief, wherein she asserted that Father should be removed as Son's conservator based upon her allegations that Son was being sexually abused by Joseph while in Father's custody.

Because Mother seeks to modify an existing order governing the conservatorship of Son, the issues are governed by Tennessee Code Annotated Section 34-4-108, which states, in relevant part:

> (a) A conservator appointed under this chapter may be discharged or have its duties modified if the court determines that the respondent is no longer a person with a disability, or that it is in the best interests of the person with a disability that the conservatorship be terminated, or that the conservator has failed to perform its duties and obligations in accordance with the law, or that the conservator has failed to act in the best interest of the person with a disability so as to warrant modification or termination. The person with a disability or any interested person on the behalf of the person with a disability may petition the court at any time for a termination or modification order under this section.

(c) The court, upon receipt of the petition filed under this section, shall conduct a hearing. . . .

(d) Upon conclusion of the hearing, the court shall enter an order setting forth the court's findings of fact and may do any of the following:

(1) Dismiss the petition;
(2) Remove the conservator and dissolve the original order;
(3) Remove the conservator and appoint a successor;
(4) Modify the original order; or
(5) Grant any other relief the court considers appropriate and in the best interest of the person with a disability.

According to the foregoing statute, in its order on modification of an existing conservatorship order, the trial court must do two things. First, the statute clearly indicates that the best interest of the ward is the paramount inquiry in any decision to modify an existing conservatorship order. Accordingly, the court's order must indicate that the deciding court has considered the ward's best interest.[1] Second, Tennessee Code Annotated Section34-4-108(d) mandates that the court's order "shall . . . [set] forth the court's findings of fact." In its June 24, 2013 order, the trial court states at the beginning of its ruling that "[t]he central issue in this case in regards to all issues currently outstanding by and between the parties is what is in the manifest best interest of the Ward." This statement is clearly in compliance with Tennessee Code Annotated Section 34-4-108(a). Moreover, as set out in context above, the trial court made detailed findings of fact in this case. Consequently, we conclude that the court's order is in compliance with the threshold requirements of Tennessee Code Annotated Section 34-4-108. Accordingly, the question presented is whether the court's findings are supported by the evidence.

The majority of conservatorship cases in Tennessee address questions concerning the

---

[1] The best interest inquiry is most often seen in cases involving child custody issues. In those cases, the Legislature has given the court specific statutory factors to consider in making its best interest analysis. *See, e.g.*, Tenn. Code Ann. § 36-6-106(a) (listing best interest factors applicable to initial custody determinations), Tenn. Code Ann. § 36-6-404(b) (listing best interest factors applicable to fashioning a residential schedule); Tenn. Code Ann. § 36-1-113(I) (outlining best interest factors applicable to termination of parental rights cases). As discussed, *infra*, the Legislature has not included specific best interest factors in the conservatorship statutes.

appointment or the termination of the conservatorship. Our research has revealed no cases that discuss the appropriate standard of review applicable to cases, such as the one at bar, dealing with modification of conservatorship orders. However, we find guidance in the case of *In re Maxwell*, No. M2002-01654-COA-R3-CV, 2003 WL 22209378 (Tenn. Ct. App. Sept. 25, 2003), where this Court held that the applicable standard of review for termination of a conservatorship is a preponderance of the evidence:

> Tenn. Code Ann. § 34-3-108(a), which deals with the discharge of a conservator, is silent as to the standard of proof required for such proceedings. We must presume this silence is purposeful and, consequently, the preponderance of the evidence standard generally applicable to civil cases also applies to termination of conservatorship proceedings. The difference in the applicable burdens can be explained by the nature of a conservatorship. A heightened standard is appropriate for the creation of a conservatorship because such a decision necessarily means a limitation on the ward's freedom of choice and a retraction of some basic rights from the ward. Such is not the case when the question under review is the termination of the conservatorship. The Legislature declined to declare the clear and convincing standard applicable to proceedings for the discharge of a conservator, and we also decline to do so. We note that a number of states employ different standards for creating and terminating a conservatorship and that the preponderance of the evidence standard is commonly used to decide whether a conservatorship should be terminated.

*Id*. at *2 n.1. Although we find no cases directly addressing the standard required for modification of conservatorship orders, we conclude that the reasoning outlined in *In re Maxwell* is equally applicable to cases involving not only termination of a conservatorship, but also to cases involving modification of an existing conservatorship order, where the Legislature is also silent as to the applicable standard. As in cases of termination of a conservatorship, decisions concerning modification of a conservator's duties, or the parameters of the conservatorship, do not require the heightened clear and convincing standard that the initial appointment of a conservator requires because the ward, in a modification action, is already under the court's control. Once appointed, "[t]he authority, rights and responsibilities of a conservator are not independent of the court." *AmSouth Bank v. Cunningham*, 253 S.W.3d 636, 642 (Tenn. Ct. App. 2006). "[Conservators] are appointed to act in the best interest[] of the disabled adult person for whom they are partially or fully responsible in the discretion of the court." *Id.* The conservator must "act as the

court's agent" and the court retains authority to discharge or modify the order of conservatorship "if the court determines that the conservator has failed to perform its duties and obligations, or if the court determines the conservator has failed to act in the ward's best interest so as to warrant modification." *Id*. at 642–43 (quoting *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App.1995)). Indeed, "[t]he court itself is ultimately responsible for the disabled persons who come under its care and protection." *Clayton*, 914 S.W.2d at 90 (citations omitted).

In conservatorship cases, the Legislature has not outlined specific factors for the trial court to consider in making its best interest analysis, *see* n.1. Accordingly, in conservatorship cases, the determination of the ward's best interest must necessarily turn upon the specific facts presented in that particular case. In reviewing the trial court's determination of whether modification of an existing conservatorship order is in the best interest of the ward, this Court will review the factual issues *de novo* upon the record with a presumption of correctness. Tenn. R. App. P. 13(d).[2] Unless the evidence preponderates

---

[2] There is some authority in Tennessee to indicate that modification of conservatorship decisions should be viewed under an abuse of discretion standard. For example, in the *AmSouth v. Cunningham* case, this Court noted, *in dicta:* "Nevertheless, the removal of a guardian is a matter of discretion, which is not to be disturbed except upon a clear case of abuse of such discretion. *Monteverde* [*v. Christie*], 134 S.W.2d [905,] 910 [Tenn. Ct. App. 1939]. **We see no reason to treat the modification of the authority, power, and duties of a conservator in a different fashion**." *AmSouth v. Cunningham*, 253 S.W.3d 636, 646 (Tenn. Ct. App. 2006) (emphasis added). This Court has indicated that issues of conservatorship are often mixed questions, which require application of more than one standard of review. As noted in *In re Conservatorship of Cross*, No. W2008-02122-COA-R3-CV, 2009 WL 3230911 (Tenn. Ct. App., Oct. 8, 2009):

> "[A] petition for the appointment of a conservator requires the lower court to make legal, factual, and discretionary determinations[,]" each of which requires a different standard of review. *Crumley v. Perdue*, No. 01-A-01-9704-CH00168, 1997 WL 691532, at *2 (Tenn. Ct. App. Nov.7, 1997). On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). We review a trial court's conclusions of law under a de novo standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v.*

(continued.....)

against the trial court's findings, we must affirm, absent error of law. *Id*. In order for the evidence to preponderate against the trial court's findings, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).[3] Furthermore, when the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). Here the trial court specifically found "that [Mother] has not told the truth and that she conveniently leaves out the truth on a regular basis." Accordingly, we will give great weight to this finding in our

---

(....continued)
        *White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).
 We review discretionary determinations under an abuse of discretion standard. *Crumley*, 1997 WL 691532, at *2.

*Conservatorship of Cross*, 2009 WL 3230911, at *2.

        Thus, the question of modification of a conservatorship order appears to be to be a mixed question, requiring both inquiry into a court's compliance with the statute, which would be viewed under an abuse of discretion standard, and inquiry into whether the evidence in the record preponderates against the court's ultimate determination.

        [3] From our research, it appears that the majority view is application of the preponderance standard in cases of modification of conservatorship orders. For example, in Texas a trial court may modify a conservatorship order if the modification would be in the ward's best interest and "the circumstances of the [ward], a conservator, or other party affected by the order have materially and substantially changed" since the time of the last order. Tex. Fam. Code § 156.101(a)(1)(A). Although Texas law differs from Tennessee Code Annotated Section 34-3-108 in that it requires a showing of a change in circumstance, "[t]he party seeking modification [of a Texas conservatorship order] has the burden to establish these elements by a preponderance of the evidence." *Zeifman v. Michels*, 212 S.W.3d 582, 587–88 (Tex. Ct. App. 2006); *accord In re A.P.M.*, No. 05-10-00679-CV, 2012 WL 2088007 (Tex. Ct. App. June 11, 2012) ("A trial court may modify conservatorship of a [ward] if the petitioner proves by a preponderance of the evidence that the modification is in the [ward]'s best interest and the circumstances of the [ward], a conservator, or other party affected by the existing conservatorship order have materially and substantially changed since the rendition of the existing order."); *Conservatorship of Kevin M.*, 49 Cal.App.4th 79, 56 Cal.Rptr.2d 765 (Cal. Ct. App. Sept. 11, 1996) ("During the conservatorship, the conservatee may petition to modify the terms of or end the conservatorship. . . . At such a hearing, the conservatee bears the burden of producing evidence and proving [his or her case] by a preponderance of the evidence." )(internal citation omitted).

-32-

review of the appellate record.

As discussed in detail above, the trial court has held that Mother had failed to prove that any sexual abuse had been perpetrated on Son. Despite the fact that none of Mother's many allegations were substantiated, her steadfast commitment to her unfounded belief that her oldest son is somehow abusing the Ward, aside from being disturbing for the reasons discussed above, has resulted in a deterioration of the relationship between the brothers. Although the evidence indicates that the brothers had been very close, Joseph testified that he had chosen to limit his contact with his brother because of Mother's continual allegations that he was abusing him. Joseph testified that he made the difficult choice to not have unsupervised contact with his brother simply because he feared that one-on-one contact with Son would result in further allegations from Mother. Father testified that, before Mother began making these allegations, the brothers:

> . . . had a great relationship, standard brothers, you know, they would go and do things. Joe might get off work early. He would take [Son] [to] Putt-Putt, take him to a movie, take him bowling, just go to hang out, maybe go eat pizza, do whatever.

From the record, Mother's tactic has resulted in a situation that is not in the Ward's best interest, i.e., an inability for Son to have a close relationship with his older brother. Nonetheless, despite its condemnation of her tactics in continuing to assert that Joseph had sexually abused his brother, at the May 28, 2013 hearing, the court explained that Son has a good relationship with Mother, and that Son clearly loves Mother:

> I believe that [Mother] needs to see her son . . . [b]ecause [Son] loves his mother.

> ***

> . . .I'm just enough of an optimist. . . [that I am not] ready to throw her out. Ready to shut her down. I'm going to give her one more chance.

Clearly, the trial court placed Son's best interest at the forefront of its inquiry in reaching its conclusion that the conservatorship order should be modified to give Mother an additional four hours per month of supervised visitation (for a total of eight hours). In this appeal, however, Mother argues that the trial court erred in granting her only eight hours of visitation with the Ward per month. Mother further contends that the court erred in requiring that her visitation to be supervised, and further erred in requiring that her telephone

correspondence be recorded by Father.

As set out above, the trial court modified the previous conservatorship order to allow Mother an additional four hours of visitation with the Ward, for a total of eight hours per month. This modification was based upon the trial court's finding that: "I believe that [Mother] needs to see her son . . . [b]ecause [Son] loves his mother." Clearly, in granting Mother additional visitation, the trial court had Son's best interest in mind. The record does indicate that Mother loves Son and that he loves her. Several witnesses, including Father, testified that Son is always glad to see Mother, and she is always glad to see him. The problem here is that Mother's love is clouded by her continued insistence that he is being abused by Joseph, and her poor judgment in engaging in social media activities as discussed in detail below. These factors weigh in favor of a limitation on the amount of time she spends with the Ward. However, in fashioning Mother's visitation schedule, and limiting it to eight hours per month, it is clear that the trial court weighed Mother's negative actions against the Ward's best interest in maintaining a relationship with his Mother, whom the Ward clearly loves. Based upon the entire record, we conclude that the evidence does not preponderate against the trial court's holding that Mother is entitled to eight hours of visitation per month.

Concerning the trial court's holding that visitation should be supervised and that Father may record telephone conversations between Mother and Son, we first note that Mother again appears to misapprehend and broaden the trial court's ruling concerning the recording of telephone conversations. As set out in its order, *supra*, the trial court held "that [Father] has specific power to tape record every telephone conversation between the Ward and [Mother]." The court, however, did not go so far as to mandate that Father tape every conversation. Rather, the court gave Father the right to tape conversations if Father thinks that those conversations are upsetting Son, or if he thinks Mother is engaging Son on the topic of sexual abuse by Joseph, which she is strictly enjoined from discussing.

The record indicates that during the pendency of this case, Mother has made a series of decisions that tend to show a lack of good judgment. First, as discussed in detail above, she has continued to levy unfounded allegations of sexual abuse relating to the Ward. Her actions have resulted in disruption to the Ward's life, and the diminishment of his once close relationship with his older brother.

In addition, during her testimony, Mother admitted that she had set up a Facebook page titled "Mr. Man Jack Turner." This page was set up after Father was named conservator over Son, and was set up without Father's permission. The page has a Paypal link and encourages visitors to make donations to "help [Son] to get home." Mother admitted that she has raised approximately $3,500 through her efforts. Mother posted portions of the original

conservatorship order on Facebook, and stated:

> This is the court order that allows the use of psychotropic drugs that [Son] never took in Nashville home with his mom, but are now administered by his father. This is the court order that says [Son] is now a ward and can be admitted into a mental hospital, group home, nursing home. What about what [Son] wants? He is 24 years old and wants to come home.

This posting to Facebook received several comments from "friends" of the page, including one comment stating: "I want to beat the [profanity omitted] out of Judge Kennedy and your ex-husband." In the first instance, the fact that Mother posted portions of the order on Facebook, and invited the public to ridicule the order of the court shows a significant lack of judgment on her part. Moreover, the statements that she made concerning the order, alleging that it allowed the use of psychotropic drugs, and allowed Son to be admitted to a mental hospital are completely unsupported by any evidence in the record. From the record, we agree with the trial court's characterization of Mother's internet activities:

> [H]er conduct was deplorable. Her claim in boasting in social media as admitted [by] her and in her conduct otherwise were–were at best slanderous, libelous, defamatory, without factual basis and were a ploy to win the favor of people to say, look at me, I have been victimized and my little boy has been victimized because this judge didn't hear the evidence.
>
> Believe me, I heard the evidence. I heard all the evidence.

Mother's social media activities, as well as her earlier email correspondence referencing the Republic of the United States of America organization indicates a real concern that she lacks respect for the trial court's orders. Although Mother explained the email by testifying that it was written by another person, and that she was not, in fact, a member of the Republic of the United States of America, she did admit that she had read the email before it was sent, and that it was sent in her name. Accordingly, from the totality of the circumstances, we conclude that there is sufficient evidence in the record to suggest a very real possibility of non-compliance with court orders on the part of Mother.

Finally, we cannot lose sight of the fact that this case began because Mother, while exercising unsupervised visitation with Son, absconded with him to Nashville. The evidence in the record does not indicate that Mother has changed to such a degree that she would never

try such a tactic again. As discussed in detail above, the shear number of allegations Mother has made against her oldest son, despite the fact that not one allegation has been substantiated, indicates that she is unwilling to let these ideations go without some mandate from the court. In short, Mother's perpetuation of the accusations against her oldest son, her forays into social media, and her general attitude at trial indicate that she has not changed. As stated by the trial court:

> [S]he uses [these tactics, including allegations of sexual abuse and use of social media] as a weapon, as a bludgeoning instrument to get her way. It's a tragedy.
> And I can tell from the look on her face, she doesn't see it, she doesn't appreciate it, she doesn't recognize it. And I doubt that she ever will.

From the totality of the circumstances, it appears that the initial observations of the guardian *ad litem* have not substantially changed: "The quality that materially separates the parties, however, is stability. The mother's unilateral decision to bring [Son] to Nashville and her lack of participation in [Son's] life over the years for whatever reason, fail to demonstrate the type of decision making required of a conservator under these circumstances." As demonstrated by the preponderance of the evidence, Mother's decision making still does not convince us that Mother's decisions will be made with the Ward's best interest as her primary objective. Therefore, we conclude that the trial court's order, requiring Mother's visits to be supervised, and allowing Father to tape record any telephone conversations, is justified based upon Mother's behavior, and that the evidence preponderates in favor of the trial court's finding that these restrictions are in the Ward's best interest.

In addition, courts have wide discretion, and an obligation, to enforce their orders. As discussed in 30 Am. Jur. 2d Executions, Etc. § 3 (2d ed.):

> Every court that has the jurisdiction to render a particular judgment has the inherent power to enforce it. A court has not only the right, but a duty to make its decrees effective, and prevent evasions thereof. The court should see to it that its judgment is enforced when the court is asked to do so by the issuance of the necessary orders and appropriate processes to make the judgment effective. The court's inherent power to enforce its decrees may at times justify the court to go beyond the parties' requests. The court also has the power and authority to exercise equitable control over its enforcement.

*Id*. (footnotes omitted).

Based upon Mother's behavior, including the evidence discussed above indicating that she might be prone to non-compliance with the court's orders, and from all of the relevant evidence in the record, we conclude that the trial court preserved the Ward's best interests by granting Mother eight hours of supervised visitation, and by allowing Father to tape record any telephone conversations between Mother and Son, which he deems to be harmful or in violation of the court's orders. In making these rulings, the trial court not only ensured that Son would not be at risk of removal from the State of Michigan by his Mother, or subject to further allegations of sexual abuse by his brother, but the court also ensured that its orders would be followed. All of which is in the Son's best interest.

For the foregoing reasons, we affirm the order of the trial court. The case is remanded for further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed against the Appellant, Marceia Turner-Bonin. Because Mother is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE